UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-20112-CR-GOLD/MCALILEY

UNITED STATES OF AMERICA,

             Plaintiff,

vs.

ALI SHAYGAN,

             Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, AND
## TO QUASH SEARCH WARRANT

Defendant filed two motions: Motion to Quash Search Warrant, or in the Alternative,

for a Search Protocol [DE 62], and Motion to Suppress Statements [DE 68]. The government

filed memoranda in opposition [DE 76, 69], and the Honorable Alan S. Gold referred both

motions to this Court for report and recommendation. [DE 63, 70]. This Court held an

evidentiary hearing on August 26, and October 6, 2008.[1]

The issues raised by Defendant's Motions arise from the events of February 11, 2008,

when Special Agents of the Drug Enforcement Administration arrested the Defendant,

searched his office and home and interrogated him. Within minutes of his arrest, the

Defendant had a brief conversation with two DEA agents about the possibility of the

_____

[1] The transcript of the August 26th hearing is filed at DE 122 and 123; the transcript of the
October 6th hearing is filed at DE 139.

Defendant speaking with a lawyer. As it turned out, the Defendant did not contact a lawyer at that time, but rather answered the agents' questions. In his Motion to Suppress Statements, the Defendant maintains that he unequivocally invoked his right to counsel, that he should not have been questioned after that point, and that what he said to the agents must therefore be excluded from evidence.

The Motion to Quash Search Warrant concerns the Defendant's laptop computer, which was seized during a consent search of his office. After the seizure, the government obtained a search warrant to search that computer and, by agreement of the parties, that warrant has not yet been executed. The Defendant asks this Court to quash that search warrant for two reasons: (1) his consent to search his office did not extend to the seizure of the laptop and (2) the scope of the later-issued search warrant is overbroad.

For the reasons explained below, this Court recommends that the Motion to Suppress Statements be granted and the Motion to Quash Search Warrant be denied.

## 1.    Evidentiary hearing

### a.    The government's case-in-chief

DEA Agent Chris Wells, who is the case agent, was the government's primary witness. Agent Wells testified that on Monday, February 11, 2008, he and other DEA agents were prepared to execute an arrest warrant for the Defendant and two search warrants, one for the Defendant's home, and the other for his Miami Beach medical office. As it turned out, after those warrants were issued, the Defendant moved his medical office a few blocks

2

to a new location. [DE 122, pp 18-21, 29]. On February 11, a DEA agent posing as a patient had an appointment with the Defendant, determined where the Defendant's new office was located, and directed law enforcement officers to that location. [DE 122, p. 21].

When the agents entered the Defendant's small medical suite they found a receptionist seated at a reception desk, and several patients seated nearby in a reception area. The receptionist said the Defendant was in his office, which was down a short hallway to the right of the receptionist. While some agents stayed in the reception area, [2] Agent Wells and Agent Guillermo Aleman entered the Defendant's office with their guns drawn. They found the Defendant seated at his desk, speaking with a patient, Carla Moore, and her 19-year-old son, Tyler Gosnell. The agents holstered their weapons and ordered the three individuals to stand and place their hands on top of their heads. Agent Wells patted down and handcuffed the Defendant. Another agent (or agents) walked Tyler Gosnell and his mother from the Defendant's office, to an empty room immediately adjacent and catty-corner to the Defendant's office. [DE 122, p. 63].[3]

Agents Wells and Aleman sat down with the Defendant in his office, and closed the door. [DE 122, p. 25, 63-4]. Agent Wells told the Defendant that a warrant had been issued for his arrest and advised him of the charges; he also told the Defendant that the agents had

---

[2] The patients in the reception area were quickly released.

[3] Three agents were responsible for staying with Mr. Gosnell and his mother while they were being held in the empty office: Chauon Whetstone, Nathaniel Holland and Ryan Knerr [DE 139, p. 11, 33], although the government never identified which of those agents walked the two patients from one room to the other.

3

search warrants for his home and former office. [DE 122, p. 26]. Agent Wells then went to his car to get his backpack, which held his consent to search and *Miranda* waiver forms, and returned to the Defendant's office where the Defendant and Agent Aleman were waiting. Agent Wells told the Defendant he did not have a search warrant for his new office, and asked the Defendant to consent to a search of that office. [DE 122, p. 27]. Agent Wells testified on direct examination that the Defendant then asked him one of the following two questions: "do I need to call my attorney?" or, "should I call my attorney now?" [DE 122, p. 27].

Agent Wells could not remember the exact words used by the Defendant. Although he prepared a lengthy report of the events of February 11, 2008, he made no mention of the Defendant's inquiry in his report. [DE 122, p. 46-51]. On cross-examination, Agent Wells was asked about this:

Q:  Okay. You said, I think to the prosecution that you weren't can exactly sure of the words that Dr. Shaygan said?

A:  That is correct.

Q:  He may have said one thing or may have said another I think you said?

A:  That is correct.

Q:  Do I need a lawyer, right?

A:  Do I need a lawyer, that is correct.

Q:  Should I get a lawyer?

A:  Correct.

Q:      May I have a lawyer?

A:      He could have said that.  He was posing in question form.

Q:      I think I might need a lawyer?

A:      Again, my recollection is either, should I call an attorney or should I call my lawyer or don't I need to call my lawyer, that's my recollection *or* may I have a lawyer.  I'm going to stick with those two statements. That's what I recall and nothing beyond that.[4]

Q:      Well?

A:      I can't honestly answer your question, sir.  I can't tell you yeah, he could have said this, he could have said that.  That's my recollection.

Q:      You don't remember?

A:      I remember he said, "do I need to call my attorney or should I call my attorney,"  That's my  recollection.

Q:      But I mean, to say that he either said one or the other, is it fair to say you didn't record this in this in your report?

A:      That is correct.

Q:      You don't remember the exact words?

A:      That is correct.

Q:      He may have said something else, you are not exactly sure?

A:      That is correct.

---

[4] In a supplemental memorandum [DE 136, p. 3, n.1], the government advised that this answer was inaccurately transcribed, and that the witness did not say the word "or" (italicized and bolded above) but in fact said "not."  The government reported that it would be filing a corrected transcript, which it has not yet done.  This Court has considered the effect of this reported (but not confirmed) error and concludes that it does not change its analysis.

[DE 122, p. 51-53].

Agent Wells testified that when the Defendant asked about a lawyer, he pulled his

chair close to the Defendant and said the following:

> Under no circumstances whatsoever were we going to deny you your right to
> an attorney, but you have a decision to make right here and right now. Either
> you are doing to invoke your right to your attorney and not answer our
> questions or you are going to cooperate with us and answer our questions.

[DE 122, p. 28]. According to both Agents Wells and Aleman, the Defendant said that he

would cooperate. [DE 122, p. 28, 66, 69].[5]

Agent Wells testified that at that point in the conversation he presented the Defendant

---

[5] Agent Aleman was present during this exchange between Agent Wells and the Defendant
and essentially corroborated Agent Wells' testimony. On direct examination, Agent Aleman
testified: ". . . I don't know the exact wording of it but . . . he had asked, 'do I need to call an
attorney, should I have my attorney. . . .'" [DE 122, p. 66]. On cross-examination Agent Aleman
elaborated:

A:    He had asked us if he needed an attorney?

Q:    What were the specific words he used?

A:    It's been so long I don't think the exact wording, but he was questioning us.

Q:    May I get a lawyer?

A:    It was like, do I need an attorney or should my attorney be here, not may I get
      a lawyer, no.

Q:    You say it's one or the other, could it have been something else?

A:    No because he was basically looking more as asking advice, do I need my
      attorney here? No may I , no, it was not.

[DE 122, p. 69].

with the Consent to Search form, which the Defendant initialed and signed.[6] [DE 122, p. 28-30]. Agent Wells left the room to tell the other agents that they could search the office [DE 122, p. 30], and then returned to advise the Defendant of his *Miranda* rights, first by reading the *Miranda* card he carried in his credentials, and then by presenting the Defendant with a *Miranda* waiver form. The Defendant read that form, initialed each line, and signed the document.[7] At the bottom of the form the agent added this statement: "I have not been coerced or threatened by agents or detectives at any point." [DE 122, p. 32-33, 54; DE 69-5]. Agent Wells asked the Defendant to write his initials next to that statement if he was in agreement, and the Defendant did so. [DE 122, p. 33].

At least two hours elapsed from the agents' entry into the Defendant's medical suite until they finished searching those offices. [DE 122, p. 41]. The agents described the Defendant as calm and extremely helpful and polite throughout that time. [DE 122, p. 34-35, 66-7, 75]. During the search of the office agents found a laptop computer in an unzipped carrying case, sitting on the floor next to the reception desk, which they seized. [DE 122, p. 73, 79-80]. At one point during the search, Agent Wells asked the Defendant whether the desktop computers in the office contained medical files; the Defendant replied that they did not, but were used for billing, and things of that nature. [DE 122, p. 37]. The Defendant said that medical files were kept on his laptop computer, which the agents had already seized.

---

[6] The government filed a copy of that form as an attachment to its opposition memorandum. [DE 69-4].

[7] The government filed the signed *Miranda* waiver with the Court. [DE 69-5].

[DE 122, p. 37-38, 59].

When they completed their search of the Defendant's office, the agents drove the Defendant to his residence, which was being searched by other agents. It was at the residence that the agents conducted their formal interview of the Defendant. [DE 122, p. 38, 40-41].

### b.    The Defendant's evidence

Tyler Gosnell testified for the Defendant. Mr. Gosnell is 19 years old. On February 11, 2008, he accompanied his mother on a visit to see her doctor, the Defendant. This was the first and only time Mr. Gosnell met the Defendant. [DE 122, p. 88-89, 99].

Mr. Gosnell testified that he and his mother were seated in the Defendant's office, across from him at his desk, when the agents came into the office and placed the Defendant under arrest, handcuffed him, and sat him down on a couch in his office. [DE 122, p. 89-94]. Mr. Gosnell was frisked, after which an agent walked him and his mother out of the Defendant's office and into an empty and immediately adjacent room. [*Id.*]. Mr. Gosnell testified that as he was being escorted out of the Defendant's office to the next room, and before the door to the Defendant's office was shut [DE 122, p. 95-99, 101-3, 119-20], he heard the Defendant ask for his lawyer:

Q:    Okay. And do you recall before the door was shut, whether or not Dr. Shaygan ever asked for a lawyer?

A:    Yes. He said it in a polite way, he said may I please have my lawyer.

Q:    And why do you remember that?

8

A:     No disrespect, but he said in like a gayish way, like it just stayed in my head because it was a funny way to say it.

Q:     . . . . Are you certain that he asked for a lawyer?

A:     I'm positive.

Q:     Did he ask a question, may I - - do I need a lawyer?

A:     No.

Q:     Did he say should I have my lawyer?

A:     No.

Q:     Did he say do I think I need my lawyer?

A:     No.

Q:     Was he clear that he wanted a lawyer?

A:     Yes.

Q:     On a scale of one to ten, with one being not sure and ten being the most sure, how sure of you that he asked for a lawyer?

A:     No. It's a ten. I'm positive. He did say, may I please have my lawyer.

[DE 122, p. 95-96]. Mr. Gosnell estimates that no more than two minutes elapsed from the time the agents entered the Defendant's office, until he and his mother were escorted to the next room [DE 122, p. 101, 115], and that he and his mother were detained for about 15 minutes, before they were allowed to leave. [DE 122, p. 106, 115].

The defense also called a polygraph examiner, Leonard Bierman, to testify about the results of a polygraph examination Mr. Bierman administered to the Defendant. [*See*

9

*generally* DE 122, p. 129-186]. Specifically, Mr. Bierman asked the Defendant if he actually and unequivocally asked for an attorney before he spoke with the DEA agents. The Defendant answered in the affirmative, and Mr. Bierman concluded that this answer was truthful. [DE 122, p. 139]. Mr. Bierman was vigorously cross-examined and the government, in rebuttal, called an FBI polygraph examiner, Michael Leverock, who questioned the reliability of Mr. Bierman's polygraph exam and his conclusions. [*See generally*, DE 122, p. 187- 196; DE 123, p. 199-235].

Whether the Defendant should have been allowed to introduce Mr. Bierman's testimony was briefed by the parties, and the subject of strong debate at the suppression hearing. [*See e.g.,* DE 106, 112; DE 122, p. 4-9, 122-129]. To allow for a complete record, I permitted Mr. Bierman to testify. Now that the record is closed, I have decided not to consider the testimony of Mr. Bierman and Agent Leverock. Expert testimony about the results of a polygraph exam can be relevant to either corroborate or discredit the testimony of the person examined. The Defendant, however, chose to not testify and thus his credibility is not at issue, and on this record I see no other probative value to Mr. Bierman's testimony.

### c.     The government's rebuttal evidence

In addition to Agent Leverock, the government in rebuttal called three DEA agents who participated in the search of the Defendant's office. [*See generally*, DE 139]. These witnesses were called to contradict Mr. Gosnell on collateral matters.

For example, Mr. Gosnell and various agents were questioned extensively about how

close the Defendant's office was to the empty room where Mr. Gosnell and his mother were held immediately following the Defendant's arrest. They were also questioned regarding whether, and exactly from what vantage point, someone in, or in front of, the empty room could see into the Defendant's office if his door were open, and exactly how much of the inside of the Defendant's small office they could see. In the end, Mr. Gosnell seemed to recall that from the doorway of the empty room there was more of a view into the Defendant's office when that door was open, than the agents recalled could be seen. The government argued that with this rebuttal testimony, it impeached Mr. Gosnell's credibility.

The testimony on this subject by all witnesses (which included confusing references to photographs of the office), was disjointed and unclear. To the extent the government witnesses contradicted Mr. Gosnell's testimony on this subject, I did not find the agents to be more credible or reliable than I found Mr. Gosnell. In the end however, this debate is not important, as all witnesses agreed that the Defendant's office was small and very close –within feet – to the empty room. More importantly, Mr. Gosnell was clear that he heard the Defendant's request for a lawyer as he was being walked from one room to the other, while the door to the Defendant's office was still open, and the government presented no evidence that Mr. Gosnell could not have heard the Defendant from that vantage point.

The government also sought to impeach Mr. Gosnell's testimony about the actions of some of the agents who were with Mr. Gosnell and his mother while they were detained in the empty room. Specifically, Mr. Gosnell testified that one of the agents made a clicking

11

noise by repeatedly opening and closing a latch that held his gun in its holster. [DE 122, p. 97-8, 104-06]. Mr. Gosnell also testified that another agent made some threatening remarks to him and his mother, to the effect that they would be arrested if they discussed what happened. [DE 122, p. 116-17]. The government called the agents who were with Mr. Gosnell and his mother at that time, who collectively denied these two points of Mr. Gosnell's testimony. [*See generally*, DE 139, p. 14-17, 24-5]. The government later argued that Mr. Gosnell's testimony on these two points was proved false, and that by extension, the government proved Mr. Gosnell was not a credible witness. In the end, I did not find this impeachment to be compelling, nor did it cause me to lose confidence in Mr. Gosnell's salient testimony.

2.    **Analysis**

    a.    **Motion to Suppress Statements**

    In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires that custodial interrogation be preceded by advice to a defendant that he has the right to remain silent and the right to the presence of an attorney. The Court directed that when a defendant indicates that he wishes to remain silent, questioning must cease, and when he asks for counsel, questioning must cease until an attorney is present. *Id* at 474.

    The Supreme Court in *Edwards v. Arizona*, 451 U.S. 477 (1981), held that once a defendant has invoked his right to counsel during custodial interrogation, he may not be

12

questioned further by the authorities until counsel has been made available to him, unless the defendant himself initiates further communication with the police. *Id*. at 484-85. This rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990). The police in *Edwards* did not follow this course: after Edwards clearly invoked his right to counsel, the police did not make counsel available to him; rather they continued to question him. The Court held that this violation of Edwards' Fifth and Fourteenth Amendment rights to counsel required suppression of his post-arrest statement.

The Defendant maintains that the government violated the rule set out in *Edwards*. Specifically, the Defendant maintains that he invoked his right to counsel by saying to Agents Wells and Aleman: "may I please have my lawyer?". Defendant argues that the agents should have stopped questioning him at that point, and in particular should not have continued with their effort to get the Defendant to sign the *Miranda* waiver and to cooperate with their investigation. Because the agents did not follow the rule set out in *Edwards*, Defendant urges that his statement to them must be excluded from evidence.

The government counters that the Defendant's statement should not be suppressed because the Defendant never clearly invoked his right to counsel. According to the government, the Defendant merely asked the agents for advice about counsel, when he said either: "do I need to call my attorney?" or, "should I call my attorney now?". The government maintains that this, at best, is an ambiguous invocation of the right to counsel,

13

which is governed by the rule established by the Supreme Court in *Davis v. United States*, 512 U.S. 452 (1994).

In *Davis*, the Court made clear that a defendant must unambiguously request counsel in order to trigger his rights under *Edwards*. "[H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id*. at 459. This is an objective inquiry. *Id*. The Court held that if the defendant's statement about counsel "fails to meet the requisite level of clarity, *Edwards* does not require that the officer stop questioning the suspect." *Id*. The Court specifically "decline[d] to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id*. at 461-62. The government argues that the Defendant did not clearly ask for counsel and its agents had every right to continue to question the Defendant, and to elicit his admissions.

There is no disagreement here that the Defendant, immediately upon his arrest, said something to Agents Wells and Aleman about talking to a lawyer; the dispute centers on the Defendant's exact words. Agent Wells does not recall exactly what the Defendant said, but his best recollection is that he either said, "do I need to call my attorney?" or, "should I call my attorney now?". Agent Wells acknowledged, however, that it is possible the Defendant's words were different than those he recalled. Agent Aleman gave essentially the same testimony: he recalled the same two alternative statements as did Agent Wells, although he

14

too said "I don't know the exact wording of it." [DE 122, p. 66].

In contrast, Mr. Gosnell was certain that the Defendant specifically asked "may I please have my lawyer?". And, Mr. Gosnell was able to explain why he had this clear recollection. ("No disrespect, but he said in like a gayish way, like it just stayed in my head because it was a funny way to say it." [DE 122, p. 95-6]). Although the government argued that Mr. Gosnell is not a credible witness, this Court did not view him that way. He appeared to be genuine in his testimony and the reason he offered for remembering the Defendant's statement had the ring of truth. Moreover, the polite manner in which Mr. Gosnell remembers the Defendant asking for his lawyer is consistent with the testimony of a number of agents that the Defendant was exceptionally polite, calm and cooperative throughout the several hour search of his office and home.

The evidence indicates that Mr. Gosnell was in a position to hear the Defendant make his statement: Mr. Gosnell testified that he heard the Defendant speak of his lawyer as Mr. Gosnell was being escorted out of the Defendant's small office, while the door to that office was still open. There is considerable evidence before this Court to support this Court's finding that a person standing in the doorway of the Defendant's office, or just outside that open door, would be able to hear what was said inside that office. Notably, the government did not call the agents who led Mr. Gosnell out of the Defendant's office to contradict Mr. Gosnell's testimony that he heard this statement.

In contrast to the clarity of Mr. Gosnell's testimony, Agents Wells and Aleman

15

admitted that they did not recall the Defendant's exact words. Both agents offered, in

tandem, the same two alternate questions they believed the Defendant spoke ("do I need to

call my attorney?" or, "should I call my attorney now?"). The credibility of their recollection

is undermined by the fact that, rather than being interviewed and prepared separately to

testify at the suppression hearing, government counsel prepared the agents together for the

hearing. Having been prepared together in this fashion, and not having the benefit of a

contemporaneous report of the Defendant's statement to refresh their memory, the quality

of the agents' recollection is not particularly reliable.

"Credibility determinations are typically the province of the fact finder because the

fact finder personally observes the testimony and is thus in a better position than a reviewing

court to assess credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749

(11th Cir. 2002), citing *Viehman v. Schweiker*, 679 F.2d 223, 227-28 (11th Cir. 1982))

(affirming the role of the fact finder in assessing credibility based upon "the unique position

occupied by the fact finder and [the fact finder's] ability to view first-hand the demeanor of

the witness.) This Court has carefully considered the testimony of Mr. Gosnell and Agents

Aleman and Wells, and for the reasons stated finds Mr. Gosnell's recollection of the

Defendant's statement most reliable and thus, this Court finds that the Defendant asked

Agent Wells, "may I please have my lawyer?".[8]

---

[8] It is well established that the government has the burden to prove, by a preponderance of
the evidence, that a defendant's confession was voluntary and that he waived his *Miranda* rights.
*Lego v. Twomey*, 404 U.S. 477, 489 (1972); *Colorado v. Connelly*, 479 U.S. 157, 168-89 (1986).
The government relies upon two decisions, neither of which are binding on this Court, for the

Further, this Court concludes that, by making this request, the Defendant unequivocally invoked his right to counsel. The government contends this was not a clear request for counsel, apparently focusing on the Defendant's use of the words "may" and "please." This Court rejects the notion that the polite manner in which the Defendant made his request takes away from the clarity of that request. As already noted, the manner in which the Defendant asked for counsel was consistent with his demeanor while he was in custody.

In its two memoranda on the subject, the government cites a host of decisions where courts found that the words used by defendants did not amount to a clear invocation of their right to counsel. [*See* DE 76, p. 3-4; DE 136, p. 3]. For its part, the defense cites its own list of cases where courts reached the opposite conclusion. [*See* DE 134, p. 2]. Not surprisingly, none of the requests for counsel reported in those decisions are the same as the Defendant's statement here.[9] What is clear from these decisions is that courts assess a defendant's request for counsel on a case-by-case basis and, as we know from the *Davis* decision, they do so with an objective inquiry. This Court concludes that the Defendant's request, "may I please have

---

proposition that here, the Defendant has the burden to prove that he clearly invoked his right to counsel. *See Martin v. Evans*, Case No. ED CV 04-0210 PSG (FMO), 2008 WL 724720 *20-21 (March 12, 2008, C.D. Calif.) and *United States v. Colon*, No. Crim. A. 98-587-5, 2000 WL 388728 *5 n.2 (April 14, 2000, E.D. Pa.). Without deciding that issue, this Court presumes that the Defendant has that burden, and finds that he has met it, with the testimony of Mr. Gosnell.

[9] Arguably the statement that is closest to that made by the Defendant is reported in *Cannady v. Dugger*, 931 F.2d 752, 755 (11th Cir. 1991), where that defendant said "I think I should call my lawyer." The Eleventh Circuit considered that an unequivocal request for counsel.

my lawyer" is one that a "reasonable police officer in the circumstances would understand . . . to be a request for an attorney." *Davis*, 512 U.S. at 459. There is nothing uncertain about it; to the contrary, it is a plain and direct request for counsel. Once it was made, the government agents should have ceased questioning the Defendant, until he had counsel, or until he initiated more conversation. Their continued questioning of the Defendant was done in violation of his Fifth Amendment right to counsel, and therefore it should be excluded from evidence.

      **b.**    **Motion to Quash Search Warrant, or in the Alternative, for a Search Protocol**

On February 11, 2008, shortly following his arrest at his medical office, the Defendant gave the DEA agents written consent to search that office. In the course of that search the agents found a laptop computer, inside an unzipped carrying case on the floor next to the reception desk. The Defendant does not challenge the voluntariness of his consent. He does, however, argue that the scope of his consent did not encompass the laptop computer.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?". *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The government generally has the burden of proving the validity of a consent to search, *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), and it has met that burden here. No evidence was presented at the suppression hearing that the Defendant in any way qualified his consent to search his office: he did not limit where in his office the agents

18

could search or what they could look for. The written consent itself has no qualifying language; rather it authorizes the search of the entire medical suite. [DE 69-4]. I conclude that the Defendant's consent, by any objective measure, authorized the seizure of the laptop computer.

After the laptop was seized, Agent Wells applied for a search warrant to search its contents, and in his application reported the Defendant's post-arrest statement that he used the laptop for work, including to store patient files. [DE 69-3, p. 8]. The Honorable Barry L. Garber issued the warrant on March 26, 2008, [DE 69-2]; the parties later agreed to stay the execution of that warrant so the Defendant could bring this motion. [DE 55, 57]. The warrant authorizes agents to search the computer for eight different categories of electronic records, and Defendant argues that probable cause does not support the search for these four categories:

2.    Electronic bank statements, loan applications, money drafts, letters of credit, money orders, cashier checks, bank checks, any and all records relating to banking activities and other financial transactions including the purchase of real estate and documents showing ownership of real estate.

6.    Electronic records relating to employment, wages earned and paid, and any other compensation records.

7.    Electronic records relating to local, state, and federal personal business income, sales and service taxes, including but not limited to, computation notes and records used for tax purposes.

8.    Electronic records that establish the persons who have control, possession, custody or dominion over the property searched, and from which evidence is seized, such as personal identification information, notes, other correspondence records, utility bills, rent receipts, payment receipts, financial documentation, and photographs, leases,

mortgage bills, and vehicle registration information or ownership warranties, receipts for vehicle parts and repairs.

[DE 69-2, p. 3]. Defendant asks that the warrant be quashed or, in the alternative, that the search of the laptop be limited to use of key word search terms approved by the Court.

In its review of the warrant, this Court must pay great deference to the issuing judge's determination of probable cause.

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found at a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). The Supreme Court has advised: "Probable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Gates*, 462 U.S. at 241 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)); *see also United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994).

I conclude that the search warrant gave Judge Garber a substantial basis for finding probable cause that these four categories of records may exist on the Defendant's laptop, and that these records may "reflect[] the illegal distribution of a controlled substance outside the scope of professional medical practice and not for a legitimate medical purpose." [DE 69-2, p. 1, Search Warrant].

The first three items authorize the government to search for the Defendant's financial records. Although the warrant application does not provide specific information that the Defendant has any financial records on his computer, personal and financial records are among the kinds of records that people often store on their computers, and the Court can rely upon this kind of common knowledge when assessing probable cause. Moreover, the Defendant's financial records may well include evidence relevant to his alleged criminal conduct. In other papers filed with the Court, the government has acknowledged that it must prove that the Defendant "is guilty of violating Title 21, United States Code, Section 841(a) because he is nothing more than a drug dealer who sold drugs not for a legitimate medical purpose, but primarily for the profits to be derived therefrom." [DE 84, p.2]. The Defendant has agreed that this is the proof to which the government must be held. [DE 83, p. 1; DE 88, p. 1-2]. The Defendant's financial records may shed light on the monies he earned dispensing controlled substances, and thus directly bear on his alleged criminal conduct.

The final disputed category is for records that establish ownership of the laptop. While the laundry list of examples of such documents (the words following "such as" in item number eight) is free-ranging, and includes records not likely to be found on the laptop (e.g., vehicle ownership warranties), these terms are nothing more than examples of records that might establish ownership. I conclude that the search warrant application presented to Judge Garber established probable cause that the laptop may have information that indicates ownership of the laptop, and that such information may bear on the criminal conduct for

21

which the Defendant has been charged.

For these reasons, I recommend that the Motion to Quash Search Warrant, or in the Alternative for a Search Protocol, be denied.

**3.     Conclusion**

For the foregoing reasons, this Court respectfully RECOMMENDS that Defendant's Motion to Quash Search Warrant, or in the Alternative, for a Search Protocol [DE 62] be **DENIED**, and that Defendant's Motion to Suppress Statements [DE 68] be **GRANTED**.

**Objections**

The parties may file written objections to this Report and Recommendation with the Honorable Alan S. Gold within **ten days** of the date of this Report and Recommendation. Failure to timely file objections shall bar the parties from attacking on appeal any factual findings contained herein. *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir. 1988).

RESPECTFULLY RECOMMENDED in chambers at Miami, Florida this 17th day of November, 2008.

CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE

cc:     The Honorable Alan S. Gold
        All counsel of record

22