UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 08-20112-CR-GOLD/MCALILEY

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ALI SHAYGAN,

      Defendant.

_____/

## AMENDED ORDER ON DEFENDANT'S MOTION FOR SANCTIONS UNDER HYDE AMENDMENT[1]

### I. GENERAL BACKGROUND

THIS MATTER is before the Court on the Defendant Ali Shaygan's Motion for

Sanction [DE 287] pursuant to the Hyde Amendment and for other miscellaneous relief.

18 U.S.C. § 3006A. The United States has filed a response [DE 299] acknowledging that

the United States "made serious mistakes in a collateral investigation that was an offshoot

of this case and stands ready to pay the additional attorneys' fees and costs incurred by

the defendant as a result." [DE 299 at 1, 2].

The United States acknowledges that it initiated a collateral investigation into

witness tampering and authorized two witnesses, Carlos Vento and Trinity Clendening, to

tape their discussions with members of the defense team in violation of United States

Attorney's Office policy; that, although there were efforts made to erect a "taint wall," the

wall was imperfect and was breached by the trial prosecutors, AUSA Sean Paul Cronin and

_____

[1] This Amended Order corrects a few typographical errors; the substance of this
Order remains unchanged.

Andrea Hoffman, at least in part, because the case agent, DEA Special Agent Christopher Wells, was initially on both sides of the wall; and that, because the United States violated its discovery obligations by not disclosing to the defense "(a) that witnesses Vento and Clendening were cooperating with the government by recording their conversations with members of the defense team, and (b) Vento's and Clendening's recorded statements at the time of their trial testimony."   Finally, the United States "acknowledges and regrets" that, "in complying with the Court's pre-trial order to produce all DEA-6 reports for *in camera* inspection on February 12, 2009 (Court Ex. 6), the government failed to provide the Court with the two DEA-6 reports regarding the collateral investigation, specifically Agent Wells' December 12, 2008 report (Court Ex. 2) and Agent Brown's January 16, 2009 report (Court Ex. 3)." [DE 299 at 2, 3].

The United States' position is that none of these mistakes were done in "bad faith" and that immediate efforts were taken to investigate, report and rectify the matter once it came to light during the cross-examination of Trinity Clendening. Accordingly, the Government argues that the payment of fees and costs associated with the entire prosecution is not warranted under the Hyde Amendment.  In his reply, Defendant argues that while the United States has acknowledged some degree of misconduct, it fails to concede that various actions taken by the prosecution team were motivated by ill will and personal animus.  Defendant argues, therefore, that the United States' concession of liability under the Hyde Amendment is too narrow and that the payment of fees and costs from the date of the Superseding Indictment was filed in this case is warranted. [DE 309].

On March 12, 2009, after a four-week trial, the jury rendered a "not guilty" verdict on all one-hundred and forty-one (141) counts of the Superseding Indictment within three

hours of deliberation. On March 16 and 17, 2009, following the jury's verdict, I held an evidentiary hearing ("Sanctions Hearing") on the Defendant's Motion for Sanctions. At the Sanctions Hearing, the following witnesses testified: Michael Graff, the defense investigator; Courtney Beth Tucker, the witness whose telephone call to DEA Special Agent Wells triggered the collateral investigation; DEA Special Agents Christopher Wells and James Brown; and  AUSA Karen Gilbert and Sean Cronin.

## II. SUMMARY OF ORDER

I begin by acknowledging that the United States has acted responsibly, in part,  by offering to pay the reasonable attorney's fees and costs associated with Dr. Shaygan's motions to dismiss and for sanctions, and by referring this matter to the Department of Justice's Office of Professional Responsibility on March 6, 2009 for an independent investigation and recommendations regarding disciplinary actions.  I also acknowledge that the United States Attorney and his senior staff members had no direct knowledge of the events that I will describe.[2] Finally, I agree that the original indictment in this case was filed in "good faith," especially given the circumstances surrounding the death of Dr. Shaygan's patient, James Downey.[3]

---

[2] The Defendant has acknowledged that "United States Attorney R. Alexander Acosta, First Assistant Jeffrey Sloman, and Criminal Chief Robert Senior have responded to this matter with both integrity and candor." [DE 250 at 13 n.4].

[3] The problem with medical clinic "pill mills," and deaths resulting from overdoses of oxycodone, methadone and other narcotics prescribed by pain clinic doctors, has become rampant. As noted recently in the *Miami Herald*, "Broward County has become the painkiller capital of the United States, the notorious home to a cottage industry of storefront pain clinics selling alarming numbers of narcotics and feeding a brazen black market sprawling from the South and New England." *Miami Herald*, April 5, 2009, at 1A. The *Herald*  reported that "'[T]he rate of overdoses is just incredible ... It is the new epidemic of drug abuse.'" *Id.* at 22A.  Accordingly, nothing in this Order is intended to dissuade

Nonetheless, I enter a public reprimand against: (1) the United States Attorney and his senior staff members, for failure to exercise proper supervision over AUSA Karen Gilbert, the head of the Narcotics Section of the United States Attorney's Office; (2) AUSA Gilbert and her deputies for acting with gross negligence with regard to the events which ensued; and (3) the two prosecutors assigned in this case, AUSA Sean Paul Cronin and Andrea G. Hoffman.  I conclude, without doubt, that AUSA Cronin, with the assistance of AUSA Hoffman, along with DEA Special Agent Christopher Wells, acted vexatiously and in bad faith in prosecuting Dr. Shaygan for events occurring after the original indictment was filed and by knowingly and willfully disobeying the orders of this Court. These lawyers are publically reprimanded and shall be sanctioned, as set forth in this Order.[4]

The events surrounding the prosecution of Dr. Shaygan are described in detail in this Order. These events are profoundly disturbing. They raise troubling issues about the integrity of those who wield enormous power over the people they prosecute. As stated in a recent editorial in the Miami Herald,  "How many times does it need to be said? *The job of prosecutors is to obtain justice, not merely to secure convictions."*  Editorial, Miami Herald, Apr. 3, 2009, at 14A (addressing the case against former Alaska Senator Ted Stevens). I concur with the Herald's sentiment in that it embodies the essence of the oft-quoted words of Justice Sutherland in *Berger v. United States*, which are set forth at page

---

vigorous prosecution against "pill mill" doctors who are no more than "sellers" of narcotics under the guise of a prescription.  This important end, however, does not "justify the means" when the means involve vexatious and bad faith prosecutorial misconduct.

[4] The United States has advised that "AUSA Gilbert has voluntarily resigned as Chief of the Narcotics Section, and AUSA Cronin voluntarily requested a transfer out of the Criminal Division." [DE 299 at 4].

27 below.

Therefore, I write in detail to make clear what happened here because it is necessary to get to the bottom of what went wrong. I do so in hope that it will not happen again. Our system of criminal justice cannot long survive unless prosecutors strictly adhere to their ethical obligations, avoid even the appearance of partiality, and directly obey discovery obligations and court orders. Of fundamental importance, the United States may not callously invade the sanctity of a defendant's Sixth Amendment right to counsel, in an ongoing prosecution, by engaging in collateral witness tampering proceedings involving the defense lawyers and investigators without strictly complying with all constitutional and related guarantees.

Initially, it is the responsibility of the United States Attorney and his senior staff to create a culture where "win-at-any-cost" prosecution is not permitted. Indeed, such a culture must be mandated from the highest levels of the United States Department of Justice and the United States Attorney General. It is equally important that the courts of the United States must let it be known that, when substantial abuses occur, sanctions will be imposed to make the risk of non-compliance too costly.

For reasons stated in this Order, I grant full relief under the Hyde Amendment and impose individual sanctions against AUSA Cronin and Hoffman.  I order the United States to reimburse the Defendant for his entire attorney's fees and costs in this case from the date of the filing of the Superseding Indictment.  Based on the information submitted by the defense, the actual amount of fees incurred since the filing of the Superseding Indictment for work performed totaled over $1,074,300.00. With adjustments as required by the Hyde Amendment, the United States is ordered to pay attorney's fees in the amount

5

of $493,764.00 and other litigation expenses, including expert fees and costs, in the amount of $108,031.88, for a total award of $601,795.88.

Besides the public reprimand, I also enjoin the United States Attorney's Office for the Southern District of Florida from engaging in future witness tampering investigation of defense lawyers and team members in any ongoing prosecution before me without first bringing such matters to my attention in an *ex parte* proceeding. The United States Attorney also shall report his efforts toward enhanced supervision of his attorneys, and all changes to the "taint wall" policies within the United States Attorney's Office and the Drug Enforcement Administration.

## III. <u>FINDINGS OF FACT</u>

1.  On February 8, 2008, the United States filed an indictment **[DE 3]** against Dr. Ali Shaygan, setting forth 23 counts alleging that Dr. Shaygan distributed and dispensed controlled substances outside the scope of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1) *et seq*. Also included was one count alleging that such distribution resulted in the death of James Brendan Downey. *Id.* At the time of the original indictment, the 23 counts addressed prescriptions written only to James Brendan Downey and two undercover officers, Matthew Drake and Paul Williams. The lead prosecutor at the time of the filing of the indictment was AUSA Sean Paul Cronin. He was assisted by AUSA Andrea G. Hoffman.

2.  This was not AUSA Cronin or Hoffman's first encounter with members of Dr. Shaygan's defense team. In early 2008, co-counsel Marc Seitles represented defendant Evelio Conde in *United States v. Conde*, Case No. 07-20973-CR-ALTONAGA. Although the *Conde* case was unrelated to Dr. Shaygan's, the prosecutors were the same (AUSA Cronin and Hoffman) as in this case. After what was characterized as an "acrimonious trial," Mr. Conde was acquitted of all charges. Shortly after, AUSA Cronin and Hoffman filed a complaint alleging that Mr. Conde engaged in witness tampering.  According to Cronin, allegations of witness tampering had surfaced prior to trial but there had not been sufficient time to seek a separate indictment or supersede the existing indictment. **[Transcript of March 17, 2009 hearing (Tr. Mar. 17), 162:5-24]**.  Following a meeting between Mr. Seitles with senior members of the United States Attorney's Office ("USAO"), the case was dropped without an indictment. At the meeting, the defense characterized

6

the charges as "frivolous." After the *Conde* case was dismissed, relations between the prosecutors and the Shaygan defense team became increasingly strained.

3.     On February 11, 2008, DEA Special Agents arrested Dr. Shaygan.  Pursuant to a search warrant, they searched his home, and, with his consent, also searched his office.  DEA agents interrogated him and subsequently prepared a DEA-6 reflecting Dr. Shaygan's purported statements.  The DEA-6 omitted any reference to Dr. Shaygan's questions or statements relating to his right to counsel.  The defense team advised AUSA Cronin about the omission.

4.     On May 14, 2008, the Defendant filed a Motion to Suppress, alleging, in part,  that the interrogation was in violation of his *Miranda* rights because the DEA agents ignored his request for counsel.  The motion also claimed that, while two agents stood guard, "a third agent came in and out of the room several times interrogating [the Defendant], using scare tactics and repeatedly made clicking noises with his firearm ... [and] that same agent brandished his firearm in front of Dr. Shaygan, intimidating him." **[DE 68 at 2]**.  The defense later abandoned this position, but the assertion added acrimony to the relationship between the defense team and the prosecutors.

5.     On May 29, 2008, the Government, through AUSA Cronin, filed a responsive memorandum, asserting that Dr. Shaygan did not in fact "unequivocally" invoke his right to counsel. **[DE 76]**.  Instead, the Government  claimed, for the first time,  that, after the arrest, the Defendant asked "should I call my attorney?" Or, "don't I need to call my attorney?" According to Mr. Cronin,  DEA Wells advised the Defendant that he absolutely had a right to his attorney and also advised that "in no way would he be denied his right to an attorney," and that "... he could invoke his right to an attorney and not answer any questions, or he could instead cooperate with law enforcement and answer their questions." *Id.*

6.     On July 31, 2008, the parties participated in a discovery conference at the High Intensity Drug Trafficking Area ("HIDTA"") field office, during which AUSA Cronin warned David Markus, Shaygan's lead attorney, that pursuing the suppression motion would result in a "seismic shift" in the case because "his agent," Chris Wells, did not lie. AUSA Cronin did not elaborate at the meeting on what a "seismic shift" actually meant or why he would make such a statement. At the Sanctions Hearing, AUSA Cronin explained that he and Agent Wells had worked on numerous cases together and shared a friendship. **[Tr. Mar. 17, 132:1-11]**.  He claimed that his "seismic shift" statement was meant to indicate that his "happy-go-lucky" attitude with lead defense lawyer David Markus would go away and his level of cooperation would diminish. **[Tr. Mar. 17, 113:25-114:11]**.  I do not credit AUSA Cronin's explanation and, instead, I find that the use of the phrase "seismic shift" was a harbinger for events to come. Virtually all actions undertaken by Cronin throughout the remainder of the prosecution demonstrated the aftershocks of the seismic shift.

7

Even if construed narrowly, it is not possible to square the threat with a good faith prosecution of this case.

As it turned out, David Markus and Marc Seitles later met with AUSA Jeffrey Sloman and Tony Gonzalez, Mr. Cronin's supervisors, to complain about the personal animus against them by AUSA Cronin. **[Tr. Mar. 17, 94:12-19]**. This occurred a few days before the commencement of trial. *Id.* No action was taken by the USAO to investigate their complaints. At no time did Cronin advise AUSA Sloman about the recording of the defense investigator.

7.    U.S. Magistrate Judge Chris M. McAliley held two hearings on the Motion to Suppress. As noted in the Magistrate's Report and Recommendation **[DE 150]**, filed November 17, 2008, DEA Special Agent Chris Wells, the case agent, was the Government's primary witness. The Magistrate Judge found that although Wells prepared a lengthy DEA-6 report of the events surrounding the arrest of Dr. Shaygan on February 11, 2008, he made no mention of any inquiry by Defendant regarding counsel, including AUSA Cronin's claim that Dr. Shaygan had asked Wells whether he needed a lawyer. At the suppression hearing, Wells could not remember the exact words used by the Defendant **[DE 150 at 4]**. Magistrate Judge McAliley ultimately concluded on November 17, 2008 that Dr. Shaygan's post-arrest interrogation should be suppressed because he had invoked his right to counsel. She credited the recollection and testimony of a third party witness over that of DEA Agent Wells.  Moreover, the Magistrate Judge found that the "credibility of their recollection [DEA Agents Wells and Aleman] is undermined by the fact that, rather than being interviewed and prepared separately [by Mr. Cronin] to testify at the suppression hearing, government counsel [Cronin] prepared the agents together for the hearing." *Id.* at 16. Thus, the Magistrate Judge found " ... the quality of the agents' recollection is not particularly reliable." *Id.*

On December 5, 2008, AUSA Cronin filed a twenty-one page objection to the Magistrate Judge's Report and Recommendation **[DE 159]**, arguing that "the unimpeached testimony of law enforcement officers establishes that the Defendant did not invoke his right to counsel," and that "in discounting the memories of these two agents, the Magistrate Court erroneously based [her] findings on incorrect assumptions not supported by the record." *Id.* at 2, 5. Upon *de novo* review, I adopted and affirmed the Magistrate Judge's Report and Recommendation in its entirely on January 13, 2009 **[DE 192]**.

In retrospect, and in light of the evidence at the Sanctions Hearing, what I find compelling and disturbing is (a) DEA Special Agent Wells did not acknowledge in the DEA-6 that Dr. Shaygan invoked his right to counsel in *any* manner, even though AUSA Cronin eventually had to concede that those words were uttered in some form; (b) the words AUSA Cronin eventually conceded were uttered, as supported by Well's testimony at the suppression hearing, conveniently fitted the

case law cited by Cronin that the utterance was "equivocal," and (c) the Magistrate Judge indirectly admonished AUSA Cronin for preparing the agents together, finding the quality of the agents' recollection not to be particularly reliable; in other words, not credible as compared to an independent witness.

8.     Throughout the case, the defense requested *Brady* material. ***See* [DE 66]**. On August 8, 2008, Magistrate Judge McAliley issued an order expressing concern about a position taken by Mr. Cronin on a *Brady* matter (the details of which are not of concern). The Magistrate Judge commented:

> "The problem with the government's request in its sealed pleading – that the Court not reveal to the Defendant that there is no report [i.e. an interview report of a doctor] – *is that it would require this Court to engage in deception.* The government led the Defendant (and anyone else who might be following the public record of these proceedings) to believe that it would give the Court an interview report of Dr. Loucas, and the Court told the parties that it would inform them whether any part of that report must be disclosed as *Brady* material. Also, the Court has before it the pending *Brady* motion, and at the close of the status conference it advised the parties it would issue a written order resolving the one remaining issue from that motion, once it made the *in camera* review to which the parties agreed. *Thus, the Court cannot remain silent on the matter .... The Court is unwilling to do this.*" **[DE 103 at 3-4]** (emphasis added).

9.     In the meantime, the investigation progressed.  On July 29, 2008, DEA Agent Wells interviewed Carlos Vento and subsequently prepared a DEA-6.  On August 8, 2008, Wells interviewed Trinity Clendening, and a week later, he interviewed Courtney Tucker. **[DE 270-2, ¶ 5; Vento DEA-6 (Jul. 29, 2008), Clendening DEA-6 (Aug. 8, 2008), Tucker DEA-6 (Aug. 15, 2008)]**. According to the DEA-6 reports, the interviews of both Vento and Clendening stated that the Defendant offered to pay for their silence regarding the circumstances surrounding Downey's death. Both reports stated that, although Vento did not ask Dr. Shaygan for money, he asked for free prescriptions and also told Dr. Shaygan that he did not want to pay for future office visits for prescriptions.

10.    The DEA-6 prepared by Wells of his August 15, 2008 interview with Tucker contained positive statements about Dr. Shaygan. Specifically, Wells wrote that as to her initial appointment with Dr. Shaygan, Tucker "brought her MRI and other medical records with her for Shaygan to review;" "Shaygan conducted a thorough examination to include flexibility exercises" and performed a urinalysis test; and "Shaygan seemed very interested in her well being."  Tucker's fiancé Wayne McQuarrie also had an appointment with Dr. Shaygan that day and "Tucker stated Shaygan also conducted a thorough examination of McQuarrie." Throughout these

9

proceedings, Cronin claimed these positive statements were not *Brady* material. I find, however, that they are clearly *Brady*.

The DEA-6 also contained many more negative statements.  According to Wells, Tucker was "not happy" about a fee increase for visits with Shaygan; that her meetings with Dr. Shaygan "became shorter and shorter;" and his interest in her well-being decreased as time passed.  Moreover, Wells wrote that Tucker agreed with the statement that Dr. Shaygan "seemed to become more interested in making money than addressing her medical condition or improving her overall health during the year and a half that she purchased prescriptions from him." **[Tucker DEA-6, supra]**. At trial, Tucker, who was called as a witness by the Government in its case-in-chief, <u>denied</u> making any such statement when AUSA Hoffman attempted to impeach her testimony with what was in the DEA-6. **[Trial Tr., Feb. 26, 2009, 75:23-76:1]** (<u>Hoffman</u>: "Do you recall telling agents that he (Shaygan) was more interested in making money than in improving the overall health of your condition over the year you purchased medicine from him?" <u>Tucker</u>: "No."). I find Ms. Tucker's testimony at trial and at the Sanctions Hearing to be more credible than Wells' DEA-6 report.

11.    On August 20, 2008, five days after she was interviewed by DEA Agent Wells, defense investigator Michael Graff contacted Courtney Tucker by phone for eleven minutes and immediately sent to the defense team an email documenting his conversation with her.  He characterized Tucker as "awesome" and recounted Tucker's complaints about her August 15, 2008 interview with DEA Agent Wells. Most of the conversation concerned her complaints about Wells. She specifically indicated Wells was "throwing around his weight," "strong armed her," tried to put a "negative spin" on her statements, and "kept trying to put words in her mouth." Moreover, Tucker expressed concern that Agent Wells had implied that she was "addicted to pain meds" and "did favors for [Shaygan] in return for scripts."  Tucker was insistent that she was not addicted but had legitimate needs for the medications.  According to Graff's email, Tucker's recollection presents a different picture of her opinion of Dr. Shaygan than was depicted in the DEA-6.  Tucker believed and expressed to the DEA that she had "absolutely nothing but the most positive things to say about Ali as a person and a physician," that Dr. Shaygan was "extra professional and extra caring of his patients [sic] well-being," and that his exams "were always thorough."  In sum, Graff noted that Tucker had "the most positive things to say about Ali and was very turned off by the DEA and their tactics."  **[Def. Ex. 1]**. This was Graff's last direct contact with Tucker.

12.    As of this initial contact between Graff and Tucker, Tucker had not yet been named in the indictment against Dr. Shaygan.

13.    Graff next attempted to contact Tucker on August 27, 2008.  He spoke with McQuarrie instead, who according to Graff's customary follow-up email, stated that

Tucker "highly doubts the DEA will bother Courtney again because she is so pro-Shaygan" and "Courtney will do whatever it takes to help Shaygan." Finally, in mid-October, Graff was able to set up an in-person interview between Tucker and Robin Kaplan, a member of the defense team, which took place on October 23, 2008. As coordination of this meeting was Graff's ultimate goal, he had no further contact with Tucker. **[Transcript of March 16, 2009 hearing (Tr. Mar. 16), 12:24-14:2; Def. Ex. 2].**

14.     At the meeting with Ms. Kaplan, Tucker recounted her interview with Wells. Tucker told Kaplan, consistent with her testimony at the Sanctions Hearing, that Wells made her feel threatened, that he put a "negative spin on all the nice things that I thought [Shaygan] did." **[DE 297-2 at 7, 8]**. None of the defense lawyers contacted Tucker again after the in-person interview.

15.     I find Graff's emails, and his related testimony at the Sanctions Hearing, are credible and accurate for a number of reasons. I categorically reject that Graff told Tucker *at any time* that the Government would be attempting to portray her as a drug abuser during trial, and that she was possibly subject to federal prosecution based on her involvement with the Defendant (compare Well's statement in Paragraphs 18 and 19 below). My reasons include that (a) Graff had no reason to make such a statement in that Tucker already was a favorable witness to the defense; (b) Graff's email summarizing his call with Tucker was contemporaneous with the conversation with her and accurately reported their conversation; (c) Graff did not make any such statement to Vento or other witnesses; (d) Graff's email recounting his call with Vento was identical in content to the Vento recording, lending credibility to the accuracy of the Tucker email (compare Court's Exhibit 1 with Def. Exhibit 3); (e) Tucker reported no such statements to Kaplan during the October 23, 2008 in-person interview, and she testified at the Sanctions Hearing that she had no recollection of any concerns regarding Graff's telephone call to her **[Tr. Mar. 16, 59:10-16]**; and (f) Graff had no reason to contact Tucker after the Kaplan interview.

16.     On September 26, 2008 a Superseding Indictment was filed containing 141 counts against Dr. Shaygan. Besides James Downey and the two undercover officers, the Superseding Indictment named as additional victims Carlos Vento, in Counts 26-33, Trinity Clendening in Counts 34-39, Courtney Tucker in Counts 40-80, Wayne McQuarrie in Counts 81-112, Andrew Gribben in Counts 113-129, and David Falcone in Counts 130-141. **[DE 124; DE 270-2, ¶ 4]**. As of the date of the Superseding Indictment, the Government had not been able to find, let alone speak to, David Falcone.

I find that the first manifestation of the "seismic shift" was the filing of the Superseding Indictment, which took place after the commencement of the hearing on the motion to suppress. The patients that were included in the Superseding

Indictment were known to the Government long before the motion to suppress was litigated, yet no Superseding Indictment was sought at an earlier time. While AUSA Cronin claimed that the filing of the Superseding Indictment was innocuous, because it did not expose Dr. Shaygan to the risk of a greater sentence, I find the effect of the Superseding Indictment was to greatly increase the time and cost of the trial. The adding of 115 more counts resulted in the defense having to request additional continuances which kept Dr. Shaygan under strict conditions of house arrest. It also added to the "weight" of the indictment and the seriousness of the offenses as presented to the jury. The strong inferences support that the decision to file the Superseding Indictment was significantly motivated by ill-will.

17.     Although the Superseding Indictment was not filed until September 26, 2008, Courtney Tucker and Wayne McQuarrie received subpoenas on September 17, 2008 to testify as government witnesses at trial which was specially set by court order to commence on Tuesday, February 17, 2009.

18.     On November 21, 2008, Courtney Tucker left a voice message for Agent Wells, who immediately returned her call. They spoke for ten minutes. While Tucker could not remember at the Sanctions Hearing the specific reason why she called Wells, it is likely, given her positive commentary about Dr. Shaygan in her previous interview with the DEA, she was confused as to why [Tucker and McQuarrie] would be called to testify on the prosecution side. At the Sanctions Hearing, she stated that she spoke to Wells in an agitated manner and said: "I was confused as to why, after I met with Agent Wells ... why we would be testifying for the prosecution." **[Tr. Mar. 16, 61:13-22]**. She further stated: "I wanted to find out what the motivation was." She felt, "if anything, we would be on the defense side." **[Tr. Mar. 16, 63:2-63:9, 67:7-68:25]**.  She wanted reassurance from Agent Wells that the *Government* or anyone else would not portray her and McQuarrie as drug abusers or addicts. *Id.* When asked at the Sanctions Hearing *who* said that (portray as drug abuser or addicts) to her, she stated: "I don't recall who. I was talking with Wayne about it. I don't know whether he had heard that or what or whether Wayne and I just in conversation, that we were discussing it with one another, and then ... I called Agent Wells to see if that was the case or not because I couldn't understand what was happening." **[Tr. Mar. 16, 64:10-16]**.

She denied saying to Agent Wells that the defense investigator said she would be subject to federal prosecution because of her involvement with Dr. Shaygan. **[Tr. Mar. 16, 65:15-23]**. She said she would have recalled making such a statement. *Id.*

I find credible that Tucker did <u>not</u> tell Agent Wells that the defense investigator or anyone else from the defense team had tried to intimidate her in any manner, had warned her that she would be subject to federal prosecution, or told her that the government would attempt to portray her as a drug abuser.  To the contrary, the Government's portrayal of her as a drug abuser or addict was a concern she had

on her own. **[Tr. Mar. 16, 64:21-65:23]**. Moreover, when she voiced her concern that the Government would portray them negatively, *Wells said it would be the defense team that would seek to do so.* **[Tr. Mar. 16, 74:19-75:10]** ("Did you tell him (Wells) that the defense was doing anything to harass you, make you feel uncomfortable to anything like that at all?" <u>Tucker</u>: "No." <u>Markus</u>: "Did you express your concern to him (Wells) about the way they (the Government) might portray you at trial?" <u>Tucker</u>: "Yes." <u>Markus</u>: "And what did he tell you about the defense on that phone call?" <u>Tucker</u>: "*That they – that you guys would actually – would be the ones that could portray Wayne and I in that light if anybody would.*" <u>Markus</u>: "Did you believe him when he said those things?" <u>Tucker</u>: "No.") (emphasis added).[5]

Importantly, in Tucker's opinion, she felt that, in all her interactions with the defense team, she was never made to feel uncomfortable, her words were not being twisted, and she was treated very nicely. **[Tr. Mar. 16, 73:11-74:1]**. To the contrary, Tucker believed the DEA was trying to twist her words and had made her feel uncomfortable. **[Tr. Mar. 16, 74:11-74:16]**.

> I just felt like -- like I was really being pulled or trying to have my words twisted into a way I wasn't conveying it or I wasn't meaning for them to be or that really wasn't the truth about how it was. I felt intimidated. I felt uncomfortable and nervous and like I was going to say or do the wrong thing where the defense was telling me just to be honest, just tell the truth and everything will work out fine.

19. Wells' account of this conversation occurred four days after Magistrate Judge McAliley's unfavorable recommendation on the Motion to Suppress. It varied from Tucker's recollection in several key respects. At best, I conclude that Wells heard a garbled and confusing statement by Tucker of her concerns and concluded on his own that those concerns were attributable to the defense team. I find Tucker's testimony at the Sanctions Hearing more credible than Wells' testimony, particularly the testimony that it was Wells who suggested that the defense would try to portray Wayne and Tucker in a bad light at trial. I base my credibility finding on the fact that Wells had "twisted" Tucker's words in the past to fit his view of the case, he was not credible in preparing the Shaygan DEA-6 regarding Shaygan's invocation of right to counsel, and he was found not credible before the Magistrate Judge at the suppression hearing. In my view, Wells was unhappy about the way the case was proceeding. His concern was exacerbated by Tucker's telephone call. Notwithstanding, according to Wells,

---

[5] Evidently, Tucker's concerns about future government prosecutions was well-founded. Although none of the witnesses who testified for the United States have been prosecuted for doctor shopping, Tucker and McQuarrie were arrested by state law enforcement on April 1, 2009 for their purchase of pain medication. **[DE 309 at 8 n.7]**.

[Tucker] specifically told me that she had spoken to an investigator, did not name him, with the defense team and that he had indicated that she was potentially going to be portrayed as a drug dealer or a drug abuser at trial by the Government. In addition, she stated that she was concerned because she felt she had not done anything wrong and the investigator had led her to believe that she could potentially face charges from the Government based on her interaction with Dr. Shaygan in the past and through what she had told us in her previous interview. She further indicated that she was extremely concerned about this because she is the mother of a small child and did not want anything to jeopardize her ability to continue taking care of that small child.

**[Tr. Mar. 16, 99:14-100:2]**.

20.     Wells did not ask Tucker who in particular from the defense team she had spoken with.  Further, although Wells testified that Tucker told him she had the conversation with the investigator "earlier," Wells did not ask <u>when</u> she spoke with the investigator and assumed it occurred earlier that day. **[Tr. Mar. 16, 105:18-106:3]**.  Wells further did not take notes of this conversation during the time it occurred or immediately after the conversation, and did not document this conversation in a written DEA-6 until December 10, 2008. **[Court Ex. 2; Tr. Mar. 16, 100:7-100:8; 100:22-101:3]**. As noted below, this DEA-6 was not turned over to the Court even though I entered a specific order that **all** DEA-6s be provided for *in camera* review before commencement of trial. As case agent, Wells was in court when the order was issued. **[Tr. Mar. 16, 101:19-22]**. At the Sanctions Hearing, Wells acknowledged that he had previously provided Tucker's supplemental DEA-6 to the USAO, specifically to AUSA Karen Gilbert, chief of the Narcotics section. **[Tr. Mar. 16, 102:6-20]**. I reject that Wells did not understand that Tucker's supplemental DEA-6 was required to be turned over, and that he and AUSA Cronin did not discuss it.

If this DEA-6 was transmitted to the court, I immediately would have provided it to the defense team because of the very serious charge purportedly made by Ms. Tucker, as written by Wells,  that "she was advised *by the investigator* that based on the information she provided to the government regarding her association with Shaygan in an interview on August 15, 2008, federal prosecutors were planning to make her appear as though she is a drug abuser and possibly a drug distributor during the Shaygan trial." **[Court Ex. 2]** (emphasis added). <u>More importantly</u>, the December 10 Tucker DEA-6 reported that Carlos Vento had recorded his conversation with the defense investigator, Michael Graff. Otherwise stated, if this DEA-6 was turned over to the Court, Vento's digital recording of the defense investigator would have been made known to the Court and, therefore, to the defense prior to trial. This would have lead to the disclosure that Vento was acting as a confidential DEA informant which also was not disclosed to the Court and the

14

defense, as is further discussed below. I find that the failure to turn over Tucker's DEA-6, as written on December 12, 2008, was willful, vexatious and in bad faith.

21.     Immediately after Wells ended his call with Tucker, he called AUSA Cronin and conveyed to him the substance of his conversation with Tucker. The conversation lasted almost 30 minutes. **[Def. Ex. 2]**. No notes were made of the Cronin/Wells conversation. According to Wells, he told Cronin the exact substance of his conversation with Tucker. AUSA Cronin did not instruct Wells to make detailed notes of the Tucker conversation, or to cease his contact with Tucker until further instruction, notwithstanding he well knew that Wells also was functioning as the lead case agent in the case.

22.     At the Sanctions Hearing, Wells said he told Cronin that he was concerned that Tucker was **"going south"** as a witness and may be showing signs of reluctance in cooperating with the government in its prosecution of Dr. Shaygan, and felt it may be necessary for Cronin, as the prosecutor in the case, to assuage Tucker's concerns. At no point did Wells ever state or allude to Cronin that there was potential "witness tampering":

> [Witness tampering] is not something that was in my vocabulary. I don't investigate witness tampering witnesses. I have never been involved in anything like this, so that was not a term that was even in my vocabulary at that point. My concern was we had a witness who called me on a Friday evening on my cell phone and was clearly concerned and my response to that was we needed to settle her down. She seems as though she may be really upset about what could potentially happen to her at trial.

**[Tr. Mar. 16, 122:13-122:31]**.

23.     Cronin conceded that Agent Wells did not allude to witness tampering, and that it was his idea during the phone call to explore the possibility of a witness tampering investigation. **[Tr. Mar. 16, 126:24-127:2, Tr. Mar. 17, 84:19-84:21]**. Wells confirmed in his testimony that it was Cronin who first came up with the term "witness tampering." **[Tr. Mar. 16, 122:17-123:11]** (Wells: "I did not feel that [witness tampering occurred] at all. In fact, that term had not been mentioned to me until I spoke to Mr. Cronin"). Wells does acknowledge that he told Cronin of his concern that Tucker was "going south" and that he and Cronin discussed whether the defense team was "interfering with the witnesses." **[Id.; Tr. Mar. 16, 116:1-4]**.

24.     I conclude that AUSA Cronin acted, at this stage, with implicit bias, and in bad faith, in participating any further in this collateral matter after receiving the phone call from Wells, especially given his past acrimony with the defense team. Accordingly, Cronin was duty-bound to tell Wells to report the contact to his superiors and to not

involve himself any further, let alone to set in motion what Cronin (not Wells) characterized as a "witness tampering investigation." The fact that Cronin initiated an earlier "witness tampering" investigation involving a defendant represented by this same defense team is too coincidental to ignore. I also draw a strong inference that, in light of Tucker and McQuarrie's stated position in favor of the defense, and Falcone had yet to be located, Cronin shared Well's concern that his case as a whole was "going south." The strong inference here is that Cronin was concerned about future contact by the defense team with his two key witnesses, Vento and Clendening. If those two "went south," then so would much of his case, especially the twenty-year enhancement count which hinged on Vento and Clendening's predicate testimony pertinent to Counts 2 through 5 of the Superseding Indictment.

25.   Cronin then placed a call to HIDTA Deputy Chief Juan Antonio Gonzalez to discuss the proper course of action based upon the report from Wells. According to Cronin, he told Gonzalez, "it could well be that Ms. Tucker was not relaying the call correctly." **[Tr. Mar. 17, 86:19-87:11]**. Per his affidavit, Gonzalez told Cronin that if, after confirming with Wells the allegations, *Cronin* thought the matter should be investigated, *Cronin* should contact AUSA Karen Gilbert. Contrary to this statement, Cronin, at the Sanctions Hearing, testified that it was *Gonzalez's* decision to contact AUSA Gilbert. **[Tr. Mar. 17, 92:22-93:1]** (Cronin: Gonzalez indicated that I should discuss the issue further with Karen Gilbert).

On further questioning from the Court, however, Cronin admitted that it was his "decision to contact Ms. Gilbert." **[Tr. Mar. 17, 93:19-94:8]** (Court: "But you did make a decision because you decided to contact Ms. Gilbert to pursue this." Cronin: "My decision to contact...Ms. Gilbert, absolutely."). Despite assertions to the contrary in his written declaration, Cronin admitted that he in fact determined that tape recording the defense team was an appropriate means to investigate the possibility of witness tampering and contacted Gilbert accordingly. **[Tr. Mar. 17, 86:6-86:18]**. At that point of time, Cronin had concluded that the investigation also should include the defense attorneys. He later confirmed this aspect of the investigation in instructions to Wells on November 24, 2008.

I find that AUSA Gonzalez acted inappropriately by permitting Cronin to make the decision whether the matter should proceed at all and by instructing Cronin to confirm the allegations with Wells. Gonzalez was obligated to instruct Cronin, as the lead trial attorney, to cease and desist from participating in this collateral matter. Both Cronin and Gonzalez were obligated to follow their own office policy which provided guidance for prosecutors regarding potential investigation of attorneys in order to avoid "a public perception of...animus toward the attorney." **[Court Ex. 5 at 3]**. Gonzalez, at that point, should have assumed personal responsibility for investigating, or causing the investigation, of such a serious matter before further contact was made with Gilbert. While I find that Gonzalez failed in his supervising role, I do not credit Cronin's testimony at the Sanctions Hearing that he raised

doubts to Gonzalez about the accuracy of Tucker's statements. Nothing in his conduct confirms his testimony. Instead, it was Cronin who labeled Tucker's remarks as "witness tampering" and initiated further contact with his AUSA Karen Gilbert. At no time did he advise Gilbert about his "doubts." I find that there did not exist at this juncture sufficient facts for the United States to proceed in good faith on a collateral prosecution for witness tampering.

26.     On November 24, 2008 (the same date when the Government was to inform defense counsel of the contact information for government witnesses), Cronin and Hoffman placed a call to AUSA Karen Gilbert and portrayed this collateral investigation as involving witness tampering. **[Tr. Mar. 17, 7:18-8:2]**. All of this was done orally. Gilbert required no written memorandum from Cronin or DEA-6 from Wells. She did not independently call Wells to ascertain any facts or independently interview Tucker. **[Tr. Mar. 17, 17: 18-24, 18:13-19:1, 26:4-17]**. Rather, she simply listened to Cronin and deferred to his opinion as to proceeding with recording the defense team. **[Tr. Mar 17, 18:17-22; Tr. Mar. 17, 86:15-18]** (Markus: "Who was the first person who thought of tape recording the defense team .... Cronin: " ... I would assume it would be me."). Gilbert offered no satisfactory explanation at the Sanctions Hearing why one or more of these steps were not taken, although she acknowledged this was her first witness tampering investigation involving a defense investigator and the matter was of significant importance. **[Tr. Mar. 17, 12:19-15]**. At no time did it occur to Gilbert to bring the matter to the Court's attention *ex parte*.

27.     Gilbert agreed with Cronin that it would be appropriate to ask potential government witnesses to record calls with the defense team, including the defense lawyers. **[Tr. Mar. 17, 22:1-12]**. Gilbert established a "wall" and instructed Cronin that she would be the point of contact for the collateral investigation, and that Cronin and Hoffman should take no part in the investigation. Gilbert instructed Wells not to disclose information about the collateral investigation to Cronin or Hoffman. **[DE 270-4, ¶¶ 6, 7; Tr. Mar. 17, 27:12-27:20]**. But, Gilbert did not advise the DEA that Wells (who she knew was involved in the main case) should no longer be involved in the collateral investigation, and that a "walled off"agent should be assigned because she concluded it was not her place to tell the DEA what to do. **[Tr. Mar. 17, 26:18-28:15; DE 270-4, ¶ 9]**. At the Sanctions Hearings, Gilbert could not satisfactorily explain why, as head of the narcotics section, she could not legally instruct DEA to "wall off" the agent. This later became self-evident when DEA Special Agent James Brown was assigned on January 7, 2009 to replace Wells on the collateral investigation. In her affidavit, Gilbert concedes that "in retrospect, I should have urged DEA to assign a 'walled off' agent." **[DE 270-4, ¶ 9]**.

28.     Prior to the conversation with Gilbert, AUSA Cronin, not Gonzalez, called the Department of Justice Office of Enforcement Operations ("OEO") to consult about proceeding with this investigation. Cronin told Gilbert there were no prohibitions to this course of action, and that the USAO did not need their approval to conduct

recordings under these circumstances.  Cronin informed Gilbert of this conversation with OEO, and Gilbert accepted this representation and decided that government witnesses expecting calls from the defense should be authorized to make recordings of the defense team.  **[DE 270-4, ¶ 9]**.

29.    Of significant importance, Gilbert failed to inform her superiors of this investigation, as required by USAO policy on attorney investigations. **[Court Ex. 5]**.  At the Sanctions Hearing, she testified that "she thought she had." **[Tr. Mar. 17, 15:3-4]**. Her testimony in this regard only makes the matter worse. If her supervisor had knowledge of these matters but did not follow through, then the failures of judgment at the United States Attorney's Office were only compounded.  USAO policy clearly required that Gilbert notify Bob Senior, who would then advise Jeff Sloman, USAO First Assistant, and ultimately Alexander Acosta, the United States Attorney.  The purpose of the policy was to provide safeguards on any matter which could negatively reflect on a defense attorney who has become a target or subject of an investigation. **[Court Ex. 5 at 1; DE 270-4, ¶ 12, Tr. Mar. 17, 13:1-15:13]**. Pursuant to the notification process, senior members of the USAO would have the opportunity to overrule further investigation if they believed such a result is warranted. **[Tr. Mar. 17, 14:8-15:2]**.

30.    On November 24, 2008, Cronin, not Gilbert, authorized Wells to have Vento and Clendening  record calls with the defense team, even though Cronin was "walled off" from speaking to Wells about the collateral matter. **[DE 270-2, ¶ 8]**. Cronin told Wells that the United States Attorney's Office would look into the allegations of witness tampering and that he, Wells, was authorized by the United States Attorney's Office to permit Vento and Clendening to record "any" incoming phone conversation of members of the defense team, *including the defense attorneys*. **[Tr. Mar. 16, 108:24-109:8, 109:21-110:14]**. According to Wells, Cronin further stated, that, from that date forward, "there was a taint team [that] was going to be set up and he was to have no further involvement in this aspect of the continued investigation." *Id.*

31.    Cronin never raised Well's continued participation in the collateral matter with Gilbert , even though Wells continued to interact with Cronin on a regular basis as the lead agent in the main case. I conclude that Cronin intentionally desired Wells to participate in the collateral proceedings. Although Cronin claims he did not think about it as a violation of the "taint wall," I do not credit his testimony given that Cronin, who is an extremely bright and sophisticated prosecutor, well-understood the implication and benefits of continuing his regular contact with Wells as lead agent while the collateral investigation was proceeding. As a result of such contact, Cronin and Hoffman later found out that Vento had made a recording, although both deny knowing the substance (see paragraph 34 below).

32.    On December 1, 2008, Wells advises Vento to record conversations with the

18

defense team. Wells conceded at the Sanctions Hearing that he "never experienced anything like this before," and that it was "definitely unusual." **[Tr. Mar. 16, 111:10-13, 112:19-24]**.  On the same or following day, Clendening was asked to also record conversations.  According to Wells, no DEA-6s were made for either contact.

33.   On December 2, 2008, a DEA officer gave Vento a recording device; Clendening was not given one after Clendening informed Wells that he was already equipped to record phone conversations on his land line pursuant to cooperation with state authorities. **[Tr. Mar. 16, 129:2-4]**.  Wells claimed that neither Vento or Clendening were given any instructions to ask for a bribe, but did tell them (the so-called "neutral witnesses") that "some tampering with witnesses was going on ...." **[Tr. Mar. 16, 128:7-13]**. Contrary to DEA policy, Wells did not have either Vento or Clendening formally established as confidential informants prior to being authorized to record defense team members. **[Tr. Mar. 16, 242:5-20]** (Court: Wasn't a confidential source agreement required with Mr. Vento before he made those recordings...[is] that your understanding of the DEA regulations and policies? Brown: That's my understanding); **[DE 250-3, ¶ 3]**.  Wells' failure to obtain confidential agreements, which Cronin and Hoffman would have had to turn over to the defense, raises the disturbing inference that Wells was instructed not to do so. **[Tr. Mar. 17, 118:4-7]** (Markus: Whether...confidential informant agreements were entered into, that fact alone you agree with me is *Giglio*?  Cronin: I think, now that I think of it in those terms, yes, it is.")

34.   On December 9, 2008, Wells was advised by Vento that he had made a recording of his conversation with defense investigator Michael Graff. On that same day, Wells contacted Cronin to advise him about the recording. Wells testified that both Cronin and Hoffman knew that Vento had made the recording. **[Tr. Mar. 16, 137:7-11]**. Wells stated that he did not communicate to Cronin the substance of the recording. In his affidavit, Cronin states "Special Agent Wells may have indicated that it was Carlos Vento who had made the recording, but he did not tell me who had been recorded, nor did he discuss with me what the substance of the recording was." **[DE 270-2, ¶9]**.  At the Sanctions Hearing, and as corroborated by Hoffman's affidavit, Cronin conceded that he knew it was Vento who made the recording. **[Tr. Mar. 17, 103:11-12]**.

I find, without doubt, that, as of December 9, 2008, both Cronin and Hoffman knew that Vento had made a recording of a member of the defense team. Cronin also well-knew that a transcript of the recording would be prepared and, in fact, one was prepared and entered as Court Exhibit 1. Cronin also well knew that Wells would prepare a DEA-6 regarding the Vento recording. In fact, Wells prepared the DEA-6 on December 11, 2008 which included reference to both the Tucker conversation and the Vento recording of Graff. *See* Court's Exhibit 2. This was one of the DEA-6 that was not produced by Cronin as ordered by the Court, and neither Cronin nor Hoffman brought to my attention that Vento had made such a recording before he

19

testified as a witness. I find that the failure to provide this information was knowing and in bad faith. This is especially true given that the defense was requesting before trial the DEA-6s which contained *Brady* material. **[DE 212 at 6-7]** ("Through this pleading, we are respectfully requesting that the DEA-6s of the interviews of government witnesses be disclosed. These reports most likely contain a wealth of *Brady/Giglio* ... [T]he defense can think of no reason to withhold these reports ... we respectfully request that the Court review them in camera to determine whether they contain *Brady/Giglio* information.").

35.   On December 9, 2008, Wells advised Gilbert that Vento had made a recording. Gilbert instructed him not to discuss the substance of the recording with other agents or members of the trial team; however, by that time, Wells had already advised Cronin that a recording had been made. Gilbert confirmed that Cronin and Hoffman called her on December 9 to advise that a recording had been made. **[Tr. Mar. 17, 29:3-12]**. It did not strike Gilbert as a red flag that Cronin and Hoffman knew that there was a recording, even though she instructed them not to have further involvement in the collateral investigation. *Id.*

On December 10, 2008, Wells collected the digital recorder from Vento and transported it to Gilbert. The recording device itself had to be collected since it was the device that provided the recording, as compared to a tape. Both Gilbert and Wells listened to the recording at the United States Attorney's Office, although Wells had previously listened to it before arriving at Gilbert's office. On the recording, Graff explained that, as investigator for the defense team, he had been attempting to contact Vento by telephone and wanted to set up a "face-to-face" meeting with Dr. Shaygan's lawyers as soon as possible. Although not mentioned in Well's affidavit that was filed with the Court, Vento specifically attempts to elicit a bribe from Graff by explaining that he needs money, **[Court Ex. 1 at 6-7 ]** ("I'm doing real, real, real, bad with money...You know what I am saying?"), and requests that he be permitted to speak directly with Dr. Shaygan by telephone. *Id.* at 11, 12. Wells conceded at the Sanctions Hearing that Vento may have been attempting to solicit a bribe. **[Tr. Mar. 16, 131:11-19]**. As it later turns out, when a recording made by Clendening was heard in open court, Clendening appears to have attempted to solicit a bribe as well (see paragraph 36 below).

After listening to the conversation, Wells concluded that Graff had done nothing wrong. **[Tr.  Mar. 16, 130:5-7]**. He felt it was not his place to offer an opinion to Gilbert. But, Gilbert concluded, "although there was no intimidation or any effort to tamper with the witness revealed on this tape, the investigation continued. At that time, I did not make any decisions about the investigation and determined that we should continue to investigate the allegations." **[DE 270-4, ¶ 10]**.  It did not occur to Gilbert at that point to let her superiors listen to the recording or to receive their approval to proceed with the investigation in accordance with office policy. Although Gilbert did not focus on the attempt to elicit a bribe, she admitted she was

concerned about Vento's attempt to have Dr. Shaygan contact him directly. **[Tr. Mar. 17, 33:12-23]**. It did not occur to her, nor did she inquire, that Vento was a "loose cannon" and he should not be authorized to set a "face-to-face" with the defense attorneys. Nor did she question whether there was a "reasonable suspicion" to proceed further, given that only thing she knew was what Cronin orally told her. Wells never told Gilbert that "witness tampering" was Cronin's, not Well's, idea. **[Tr. Mar. 17, 50:8-18]**. Gilbert did not ask, nor did Cronin volunteer, that the relationship between the prosecution and the defense was acrimonious, although, at the Sanctions Hearing, she stated it might have affected her decision if she had known about it. **[Tr. Mar. 17, 50:19-51:4]**.

Gilbert did not consider whether the tape recording had to be turned over to the defense before Vento testified. **[Tr. Mar. 17, 42:10-15]**. She gave no instructions to Cronin or Hoffman regarding *Jencks*, *Brady* or the like. Her only instruction was for Wells "to see what happens next in terms of whether the defense investigator reaches out to the same or other witnesses." **[Tr. Mar. 17, 37:24-38:2]**. In hindsight, she conceded that she should have brought the matter to her superiors to make the decision as to whether the investigation should continue. **[Tr. Mar. 17, 36:8-18]**.

Although Wells did not express any opinion to Gilbert concerning the investigation, Wells was concerned about several "red flags." First, Wells concluded from the tape that Vento was a "loose cannon" and had tried to solicit a bribe and then requested Graff to have Dr. Shaygan call him, all contrary to Wells' instructions. **[Tr. Mar. 16, 136:8-18]**. Wells did not clearly recollect commenting to Gilbert about these matters. What Wells did remember saying to Gilbert was that Vento "... was not listening to my instructions." **[Tr. Mar. 16, 133:18-21]**. Second, Wells' major "red flag" was that, although there was nothing incriminating on the tape, "there was the green light or the go ahead ... to record the defense attorneys." **[Tr. Mar. 16, 135:6-12]**. Wells was concerned about proceeding with the collateral investigation "because of the fact that there was potential that attorneys were going to be involved in this." **[Tr. Mar. 16, 114:6-11]**.

Because Gilbert was becoming involved in a murder trial, she assigned AUSA Dustin Davis to be the point of contact on the collateral investigation. She briefed him on the recording and gave him contact information. In hindsight, Gilbert acknowledges that, as the Chief of Narcotics, and because of the importance of the matter, she should have requested information about further contacts from Wells at least through January 5, 2009 when Dustin Davis became acting chief. **[Tr. Mar. 17, 43:3- 44:25]**.

36.   Wells did not give a recording device to Clendening because Clendening advised him that he already had such a device on his home phone. Apparently, Clendening was recording other persons on behalf of State authorities in order to receive a lesser sentence in a serious drug case that was pending against him at the time. On

December 21, 2008, Wells received a voice mail from Clendening saying that he attempted to record a conversation with David Markus but that the device came unplugged so only a small portion was recorded. **[DE 250-2, ¶ 10]**. On December 29, Wells called Clendening to confirm the substance of his earlier conversation with Markus. During the conversation, Clendening confirmed that only a small portion of the conversation was recorded, but that Markus wanted to set up a face-to-face meeting. Wells stated that he did not listen to the first recording or report the content of this conversation to either Cronin or Hoffman. **[DE 250-2, ¶ 11]**.  Wells testified that he did not know that Clendening had recorded a second conversation with David Markus prior to the first of the series. As heard in open court on March 10, 2009, during this conversation, Markus attempted to clear the air with Clendening with respect to an earlier conversation, and told Clendening that he did not want him to get the impression he would be paid any money for his time or cooperation, only transportation costs needed for Clendening to meet with the defense team in person. **[DE 250-5 at 1]** (Markus: "You know, I just wanted to make it clear I want the truth...I am not paying any money for anything...I just wanted to make clear because I was thinking about the call and I didn't know when you were saying that you needed money.  I just wanted to make sure...What I will do to help you with this is I will have my investigator pick you up...or pay for a cab or I can pay for gas money. Those are the only things I can do.")

37.     On January 5, 2009, after returning from annual leave, Wells was advised that the collateral investigation had been reassigned to a senior special agent within the DEA group, Special Agent James P. Brown. **[DE 250-2, ¶ 12]**. According to Brown, he was debriefed by other agents and was told that the matter involved potential witness tampering. **[DE 250-3, ¶ 1]**.  He also was debriefed by Wells. Wells advised Brown about the Vento recording and the malfunction of the recording attempted by Clendening. **[DE 250-3, ¶ 2]**.

38.     On January 9, 2009, Brown attempted to contact Vento and Clendening to establish them as confidential informants.  Brown stated, "I made efforts to contact Vento and Clendening and coordinate future efforts with the two witnesses to record future conversations with members of the defense team. *This effort could not be undertaken until Vento and Clendening were formally established as DEA confidential informants for the specific purpose of this taint investigation.*" **[DE 250-3, ¶ 3]** (emphasis added).

39.     On January 15, 2009, Brown spoke with Vento, and on the same or the following day, Brown spoke to Clendening by phone, to coordinate the process of establishing them as confidential informants. **[DE 250-3, ¶ 3; Tr. Mar. 16, 250:12-18]**. By January 15,  Brown knew that both Vento and Clendening would be witnesses at trial. **[Tr. Mar. 16, 250:19-22]**. With this knowledge, Brown told both Vento and Clendening that he was running the investigation into witness tampering by the defense team. **[Tr. Mar. 16, 250:23-251:3]**. Although Brown was speaking to

Clendening and was attempting to sign him up as a confidential informant, Brown denied that Clendening told him anything about his recording of a second phone conversation with David Markus prior to the end of December. **[Tr. Mar. 16, 249:14-250:6]**. Brown testified that he was not even aware that Clendening had a recording device, **[Tr. Mar. 16, 248:23-249:3]**, although, in direct contradiction, he stated in his affidavit, "[o]n...January 9, 2009, I was advised by DEA Special Agent Christopher Wells of the nature of the investigation ... [and that] Clendening had attempted to *record* a conversation with the defense team, but that the recorder had malfunctioned." **[DE 250-3, ¶ 2]** (emphasis added). At a minimum, it is difficult to understand why Brown would not ask Clendening if recordings had occurred when he was attempting to establish him as a confidential informant.

40.     On January 16, 2009, Vento signed a confidential informant's agreement **[Court Ex. 4]**. According to Brown's DEA-6, which was prepared on March 3, 2009, Vento, earlier on January 16, 2009, "agreed to actively participate to determine if additional statements or evidence of witness tampering can be realized." **[Court Ex. 3]**. Vento was instructed by Brown to set up a face-to-face conversation with the defense team and "kind of see what happened." **[Tr. Mar. 16, 246:4-10]**. This crucial DEA-6 was not turned over to the Court as ordered prior to trial.

41.     Cronin discussed the fact of Clendening's testimony in the Shaygan trial with the state prosecutor involved in Clendening's state case at some point *prior* to Clendening's sentencing and prior to his testimony in this case. Cronin conceded that he may have spoken with Clendening's lawyers as well. **[Tr. Mar. 17, 119:10-13, 18-24]**.  The state court judge also was informed about Clendening's role as a witness for the government in the Shaygan prosecution. *Id.*  A reasonable inference is that Clendening received some benefit from the state prosecutor and state judge after being advised of his role in the Shaygan trial. Cronin did not bring these facts to the defense's attention. Rather, it was the defense that put the state plea proceedings into evidence during the trial, following Gilbert's disclosure to the Court.

42.     On February 9, 2009, Cronin and Hoffman call Brown (in violation of the "taint wall") to make him aware that the trial was to commence on February 17, 2009. **[Tr. Mar. 17 251:15-22]**.  According to Brown, they "wanted to know what was going on" and what "progress" or "success" he had in setting face-to-face meetings between Vento/Clendening and the defense team. **[Tr. Mar. 16, 261:21-262:23]**. They told him: "[W]e [have] trial coming up on February 17, 2009"). *Id.* They specifically asked Brown, "... did you set up face-to-face through these two witnesses (Vento and Clendening) with the defense lawyers or the defense investigators .... *Id.*

The significance here is that (a) Cronin and Hoffman were advising Brown that he had eight days to conclude his investigation. **[Tr. Mar. 16, 261:6-12]**; and (b) Cronin and Hoffman well-knew that Vento and Clendening were operating as confidential (not neutral) witnesses and never disclosed it to the defense or the Court. Brown

testified at the Sanctions Hearing that "they were the trial attorneys involved in the case, and I wasn't sure if I was supposed to talk with them or not." **[Tr. Mar. 16, 263:21-264:3]**.

Of grave concern  is that Cronin did not include this conversation with Brown in his affidavit that was filed with the Court in anticipation of the Sanctions Hearing. **[DE 270-2]**. I find it purposeful that even though Cronin knew that Vento made a recording and knew that he was working with Wells, he did not reveal the information to the Court or to the defense even during trial, and, *most telling*, purposefully steered clear of it in his questioning of Vento on direct examination. **[Tr. Mar. 17, 116:12-14]**. Further Cronin did not disclose that he knew Clendening, who testified for the Government after Vento, was working with Wells and that he had agreed to make recordings. **[Tr. Mar. 17, 116:18-25]**.

Even after Clendening gratuitously stated on cross-examination that he had recorded Markus, Cronin did not disclose any *Brady/Giglio* information to the Court or the defense; nor would such disclosure have been likely if Clendening did not "blurt out" something about a recording. **[Tr. Mar. 17, 117:4-11]** (Markus: "If he hadn't blurted that out about the recording, nothing regarding Vento or Clendening would have been disclosed to the defense? Cronin: "I don't believe so, certainly not by way of this case. I don't know obviously if there would have been further work in the collateral investigation that would have led to that being disclosed at some later point, but as far as I know in all likelihood, not."). Of course, by the time of collateral proceedings, Dr. Shaygan could have been serving a twenty or more year sentence.

I find that Cronin and Hoffman were contacting Brown, and urging progress on the face-to-face contacts with the defense lawyers and investigators, for the bad faith purpose of seeking to disqualify the defense lawyers for conflict-of-interest immediately prior to trial. At the Sanctions Hearing, Cronin conceded that he considered the *McLain* issue as it related to the defense lawyers and that recusal by the defense team would have been necessary.[6] **[Tr. Mar. 17, 111:24-112:22]** (Court: "... wasn't that a concern to you, that right before this trial ... Mr. Markus ... would ... have [had] to recuse himself [because] his client [would not] have [had] confidence in him because of whether he's making decisions for himself versus his client? Cronin: "Absolutely ... that is why I went ... to AUSA Davis to determine whether or not there was going to be any conflict issues that needed to be raised.").

Cronin's effort to blame AUSA Davis is disconcerting. At a minimum, it is a further indictment of the lack of supervision in the United States Attorney's Office. More likely than not, Cronin simply was trying to get information from Davis about the status of the collateral investigation. This was of "immediate concern" to him. Cronin acknowledged that any such conflict issues would have to be filed

---

[6] *United States v. McLain*, 823 F.2d 1457, 1463-64 (11th Cir. 1987).

"immediately" with the Court.  When asked by the Court if that was "tactical" on his part, he answered "No, absolutely not, your Honor."  When asked by the Court, "If I find it tactical, then it would be bad faith, wouldn't it," he replied, "I believe it would, your Honor." **[Tr. Mar. 17, 112:11-113:9]**.

The effect of such a motion to recuse, if granted before trial, would have been *catastrophic*. Cronin already knew that Dr. Shaygan was having significant psychological problems as a result of strict home detention and electronic monitoring based upon the prior defense motions filed to lift such restrictions. Cronin also well-knew that if Markus and his investigators were recused, new lawyers and investigators would have had to be appointed at a great cost, and the trial would have been continued for an unknown time period – all to the detriment of Dr. Shaygan and, in my view, to force him to plead guilty which he consistently refused to do. I find Cronin's efforts in this regard were tactical and in bad faith.

43.   On February 13, 2009, prior to the commencement of trial, Brown contacted AUSA Dustin Davis and told him that while efforts were made to coordinate meetings with Vento and Clendening and the defense team, no such meetings had occurred. **[Tr. Mar. 16, 247:15-24]**. Nonetheless, Brown told AUSA Dustin Davis during that phone call that he had signed up Vento as a confidential source and was attempting to sign up Clendening. **[Tr. Mar. 16, 247:25-248:3]**. Therefore, prior to trial, AUSA Davis, knew, without doubt, that Vento was operating as a confidential informant under a formal agreement. Davis, although functioning as "acting head of the narcotics division," took no steps to ensure that notice of these circumstances were given to the defense once the Shaygan trial commenced on February 17.

44.   On February 14, 2009, Cronin, in response to a court order on February 12, 2009, filed with the Court, along  with an accompanying letter "... DEA-6 reports for government, defense and non-testifying witnesses." **[Court Ex. 6]**. In response to the Court's questioning at the Sanctions Hearing, Cronin stated that he had asked Wells to gather all the DEA-6s. **[Tr. Mar. 17, 99:24-100:9]**. Cronin testified that he "did not specifically ask Agent Wells for 6s that may have been generated in the witness tampering investigation." **[Tr. Mar. 17, 100:10-15]**. He stated "It didn't occur to me that there were other 6s that may be out there that I needed Agent Wells to gather for me [and] "in retrospect I should have specifically asked Agent Wells ... or asked AUSA Davis or Gilbert ...." **[Tr. Mar. 17, 100:16-101:2]**. I do not find Cronin's testimony that "it did not occur to him" that DEA-6s existed for the collateral investigation to be credible.

Although Cronin says that he should have asked AUSA Davis for DEA-6s, he testified that he called Davis to ask: "Is there anything I need to know before this trial starts with respect to the collateral investigation," and Davis indicated that "he didn't believe there was anything but he would check with the agent on the case." **[Tr. Mar. 17, 102:5-17]**. Cronin acknowledged that the office as a whole had the

obligation to respond to the Court's order. **[Tr. Mar. 17, 124:16-20]** (Court: "Doesn't the office itself, together with the agents under the law, have an obligation to be aware of these things and inform the Court? Cronin: "Absolutely. I completely agree and, Your Honor, we should have done a better job. There is no doubt about that.").

But, I do not find that the issue is just whether the USAO should have done a "better job." Rather, I find what occurred here was "tactical." AUSA Cronin's "attempt at cover" and "finger pointing to Davis" is not credible. First, according to Brown, Davis, on February 13th, was told by Brown that he had signed up Vento as a confidential informant. It is incredible that Davis would not tell this to Cronin in response to the Court's order. Second, Cronin already knew that Vento had made a recording. At the Sanctions Hearing, Cronin said he was not "thinking about" the fact that a DEA-6 would have had to be made of the recording," although he was aware it was "normal procedure" to have a DEA-6 of the recording. **[Tr. Mar. 17, 103:23-104:11]**. For Cronin to claim, as he did, that "he was not thinking about it" is blatantly inconsistent with the fact that he called Brown before trial to check on the status of the collateral investigation – a fact that was patently omitted from Cronin's own affidavit. Cronin acknowledged that, if this Court knew about the two DEA-6s of Wells and Brown, it would be of "grave concern." **[Tr. Mar. 17, 104:18-25]**. But, he claims that it never occurred to him to ask Vento, one of his key witnesses, whether he was signed up with a confidential source agreement either before or after the recording – not even after the trial began and the collateral investigation had terminated. **[Tr. Mar. 17, 106:1-15]**.

45.     Following Clendening's statement about recording David Markus on February 19, 2009, Gilbert appeared before the Court on February 23, 2009, to disclose that conversations with both Graff and Markus were recorded by Vento and Clendening. She stated that no one in her office knew about the second Clendening recording until Clendening testified about it in open court. As of the date of her appearance, Gilbert concluded that there was no wrongdoing by the defense team. At the time of her announcement, Gilbert had no more information than when she had met with Wells originally to review the Vento recording. At the Sanctions Hearing, she claimed that she had reached her decision as a matter of timing, namely, that the trial was underway and the investigation was closed. **[Tr. Mar. 17, 58:8-15]**

I find that the United States did not come forward in good faith to disclose what had transpired until its hand was forced by the statement that slipped out during Clendening's testimony. Even *after* Clendening revealed the existence of the tape during his testimony, the matter came to light only by "accident." Gilbert testified at the Sanctions Hearing that "*[I]t was merely by accident .... We were out at a restaurant Thursday evening talking about work and that's how it came up. It was not a, "Let me notify you as my boss." I happened to be with a group of people, Mr. Cronin and Ms. Hoffman were there and told the story. It was the first I heard of it.*" **[Tr. Mar. 17, 47:18-48:7]** (emphasis added).

I find it astounding that Cronin and Hoffman would casually discuss the matter at a restaurant, after Clendening's testimony on that Thursday, and not immediately disclose the matter to the Court once it occurred. Because they did not even officially report the matter to Gilbert, let alone the Court, the strong inference is that they were "bragging" to their colleagues about what they were getting away with. At least Gilbert understood its significance and reported the matter to her superiors. Cronin and Hoffman's failure to disclose to the Court was not the result of inadvertence or mistake, but was knowing and intentional.

Following Gilbert's appearance, I ordered that affidavits be filed under oath by "anybody who has knowledge of this situation." Ultimately, I reserved on the defense motion to dismiss the indictment and permitted the defense to re-cross Vento and Clendening. I also gave the jury a strong instruction that the re-cross was occasioned by the Government's misconduct.

## IV. <u>CONCLUSIONS OF LAW</u>

A.     <u>Ethical obligations of prosecutors</u>

A prosecutor has a responsibility to strive for fairness and justice in the criminal justice system.  *U.S. v. Okenfuss,* 632 F.2d 483, 486 (5th Cir. 1980).  This "sworn duty" requires the prosecutor "to assure that the defendant has a fair and impartial trial," and the prosecutor's "interest in a particular case is not necessarily to win, but to do justice." *U.S. v. Chapman,* 524 F.3d 1073, 1088 (9th Cir. 2008) (quoting *N. Mariana Islands v. Bowie*, 236 F.3d 1083, 1089 (9th Cir.2001)).  As expressed in the oft-quoted words of Justice Sutherland in *Berger v. United States:*

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed.

295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935), overruled on other grounds by *Stirone v. United States*, 361 U.S. 212, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960); *see also United States v. Williams*, 504 U.S. 36 (1992); *United States v. Okenfuss,* 632 F.2d 483, 486 (5th Cir. 1980); *United States v. Garza,* 608 F.2d 659, 663 (5th Cir. 1979).

The Eleventh Circuit has expressed similar sentiment:

> A United States district attorney carries a double burden. He owes an obligation to the government, just as any attorney owes an obligation to his client, to conduct his case zealously. But he must remember also that he is the representative of a government dedicated to fairness and equal justice to all and, in this respect, *he owes a heavy obligation to the accused.* Such representation imposes an overriding obligation of fairness so important that Anglo-American criminal law rests on the foundation: better the guilty escape than the innocent suffer.

*United States v. Wilson,* 149 F.3d 1298, 1303 (11th Cir. 1998) (quoting *Dunn v. United States*, 307 F.2d 883, 885 (5th Cir.1962) (emphasis added)).  A prosecutor is held to these standards in his individual capacity.  *See e.g.*, *Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1327 (11th Cir. 2002) ("Independent judgment is an essential ingredient of good lawyering, since attorneys have duties not only to their clients, but also, as officers of the court, to the system of justice as a whole.") (internal quotation omitted)); *United States v. Van Nuys*, 707 F. Supp. 465, 470-71 (D. Colo. 1989) ("It is the duty of a prosecutor, himself, to evaluate the credibility of the witnesses he calls to the stand.").

The various deficiencies in Cronin's conduct constitute unethical behavior not befitting the role of a prosecutor.  As an initial matter, Cronin's displeasure and ill-will toward defense counsel as a result of Defendant's Motion to Suppress, as evidenced by

his "seismic shift" comment, led to the filing of a Superseding Indictment that significantly prolonged Shaygan's house arrest and created huge additional costs and expenses to his defense. Such a "threat," regardless of how Cronin now argues it should be interpreted, is inappropriate in the face of a legitimate motion by the defense, one on which the defense ultimately prevailed. Further, the collateral investigation was unfounded, motivated in part by Cronin's personal animus against the defense team and fueled by his deliberate failure to exercise independent and objective judgment regarding the basis for such an investigation. Indeed, although Wells only expressed concerns that Tucker may be "going south" and that she needed to be "settled down," Cronin unilaterally proceeded to explore the possibility of a "witness tampering" investigation. The pursuit of the collateral investigation further evidenced Cronin's central role in attempting to improperly secure incriminating evidence against the defense team to his advantage. *See United States v. Sam Goody*, 518 F.Supp. 1223, 1225 n.3 (E.D.N.Y. 1981) ("[W]e believe that it was unethical for the government to "wire" an informant and send him to one of the defendants' offices in an attempt to elicit incriminating statements after that defendant's attorney had presented himself to the prosecutor and told him to deal with his client only through him (the attorney)...."). It was Cronin's idea to seek Gilbert's approval to pursue the investigation and to record the defense team, and he and Hoffman breached the "taint wall" to ascertain from Agent Brown if such recordings or subsequent in-person contacts with the defense team had yielded any evidence of witness tampering.

Such an unfounded investigation is all the more egregious given the severity of prejudice to the defendant, facing a count carrying a minimum sentence of twenty (plus) years, that would have resulted from disclosure to this Court close to the start of trial that

the defense team was under investigation by the USAO for witness tampering.  The Eleventh Circuit has held that a defendant is deprived of her Sixth Amendment right to competent counsel where her counsel at the time of trial was under investigation by the same United States Attorney's office.  *United States v. McLain*, 823 F.2d 1457, 1463-64 (11th Cir. 1987) (overruled on other grounds); *see United States v. Novaton*, 271, F.3d 968, 1012 (11th Cir. 2001) (affirming the validity of *McLain*).  In *McLain*, defendants were convicted by jury trial for violating the federal RICO statute, extortion and other related crimes.  The Court concluded that the defendants did not receive a fair trial.  As to one of the defendants, the Court found, among other reasons, that he was deprived of his right to competent counsel because unbeknownst to him (or the court), his counsel at the time of the trial was under investigation for bribery by the same USAO that was prosecuting the defendant.  The Court concluded that a conflict-of-interest existed for counsel because "his personal interests or desires will, or there is a reasonable possibility that they will, affect adversely the advice to be given...to the [client]."  *Id.*

In contrast to *McLain*, where the defense counsel was under investigation for a crime unrelated to charges against the defendant, here, defense counsel would have been under investigation for crimes that threatened the integrity and fairness of the trial.  Were the government to inform the Court at the eve of trial or during the course of the trial that the defense team was under investigation for witness tampering, under the principles of *McLain*, and as conceded by Cronin, the defense team would be forced to withdraw its representation of Dr. Shaygan.  In fact, David Markus made this motion orally as soon as he heard about the investigation.  Such a development would have deprived the defendant

30

of a defense team that had become intimately familiar with his defense, causing him severe prejudice.

Finally, Cronin, along with Hoffman, did not intend to bring the existence of the collateral investigation to my attention. As detailed above, Gilbert brought this matter to my attention on February 23, 2009, who had found out by sheer coincidence when socializing with Cronin and Hoffman on the evening of February 19, 2009 that Clendening had mentioned his recording during cross-examination. While the existence of Clendening's second recording was unknown to all involved, Cronin and Hoffman's failure even at this point in time to realize the need for disclosure of the collateral investigation and the cooperative involvement in the investigation by two central witnesses for the prosecution – Vento and Clendening – is an egregious abdication of their ethical obligations. While Gilbert proclaims that the government in good faith brought these matters to my attention expeditiously after immediate consultations with Messrs. Senior and Sloman, her sentiment does not disguise the fact that Cronin and Hoffman did not believe there was a need for disclosure or otherwise go to anyone to ask for direction on how to proceed. Had Gilbert not met Cronin and Hoffman socially on the evening of February 19, 2009, none of the disclosures before me would have transpired, and the jury may well have reached a different result. In sum, Cronin, as aided by Hoffman, exhibited a pattern of "win-at-all-cost" behavior in the conduct of this investigation that was contrary to their ethical obligations as prosecutors and a breach of their "heavy obligation to the accused."

B.      Discovery Violations

In addition to unethical conduct, Cronin, who conceded he was ultimately

responsible for all aspects of discovery, *see* Tr. Mar. 17, 142:8-13, committed violations under *Brady, Giglio,* and *Jencks*.

        1.    <u>Brady</u>

      The seminal decision in *Brady v. Maryland* requires the prosecution to disclose to the defense evidence that is both favorable to the accused and "material either to guilt or to punishment." 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L. Ed. 2d 215 (1963). The non-disclosed evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985) (citing *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068, 80 L. Ed. 2d 674 (1984)). The Eleventh Circuit has consistently held that in order to establish constitutional error in violation of Brady, a defendant must show: (1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been revealed to the defense, there is a reasonable probability that the outcome of the proceedings would have been different.[7] For purpose of *the Brady* rule governing suppression of evidence, the Government may not just assert ignorance of information another branch of the Government may have. *Halliwell v. Strickland*, 747 F.2d

---

[7] Florida Bar Rule 4-3.8(c) similarly requires a prosecutor in a criminal case to make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense.

607, 609 (11th Cir. 1984); *Stephens v. Hall*, 407 F.3d 1195 (11th Cir. 2005) (*Brady* applies

to evidence possessed by the prosecution team, which includes both the investigators and

prosecutors).[8]  Finally, *Brady* material should be disclosed in time for it to be effectively

used by the defense.  *See United States v. Bailey*, 123 F.3d 1381, 1398 (11th Cir. 1997).

The Eleventh Circuit has held that DEA-6 reports may constitute *Brady* materials.

*See United States v. Khoury*, 901 F.2d 948, 969-70 (11th Cir. 1990) (remanding to district

court the question of whether DEA-6 reports constitute *Brady* material).  Here, certain of

the DEA-6 reports that the defense did not possess and that could not have been obtained

by reasonable diligence were withheld in violation of the prosecution's obligations under

*Brady*.  First, and most significant, was the non-disclosure to the defense or to the Court

of the two DEA-6s discussing Vento's recording of his conversation with Graff (Court Ex.

2) and the establishment of Vento as a confidential informant (Court Ex. 3).  The

impeachment value of these two reports clearly meets the materiality threshold required

by *Brady*.  Vento and Clendening were critical witnesses for the prosecution's theory that

Dr. Shaygan, in the course of his illegitimate medical practice, prescribed medication to

---

[8]  Fed. R. Crim. P. 16(a)(1) addresses the discovery of documents and tangible objects. Under Rule 16(a)(1)(E), the government must permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, if the requested items (1) are material to the preparation of the defendant's defense; (2) are intended for use by the government as evidence in chief at the trial; or (3) were obtained from or belong to the defendant. Although Rule 16(a)(1)(E) did not codify the holding in *Brady*, the rule's requirement that the government disclose documents "material to the preparation of the defendant's defense" indicates that the drafters of the rule recognized the government's Brady obligation. *United States v. Jordan*, 316 F.3d 1215, 1250 n.74 (11th Cir. 2003). As such, *Brady* requires the prosecutor to turn over to the defense evidence that is favorable to the accused, even though it is not subject to discovery under Rule 16(a), since, eventually, such evidence may "undermine[ ] the confidence in the outcome of the trial." *Id.*

Brendan Downey that resulted in his death.  Cronin's opening statement reflected the

importance of Vento and Clendening to his case.

> [Vento and Clendening] will both testify and they will both tell you what
> happened that day.  They will tell you how when they got into the
> defendant's office, Carlos started questioning the defendant about his
> ridiculous practices with Brendan, seeing him at a Starbucks where he
> didn't have even a scale of a blood pressure machine, nothing to even
> make the pretext of being a doctor rather than a drug dealer.... [Vento
> was asked] questions about Brendan Downey and right in front of
> [Vento]...[Defendant] started filling in more information to Brendan's file,
> retroactively trying to make it look like he treated Brendan as a doctor
> rather than selling him scrips as a drug dealer. [Defendant] then pulled
> out this checkbook and asked Carlos what he wanted.  Carlos told him
> he didn't want to make money off of Brendan's death, but he did want
> free prescriptions for himself, for Trinity Clendening and for his wife,
> Carey Holmes Vento...and the defendant readily agreed....This was a
> bribe to heave Carlos and Trinity keep their mouths shut about his role
> in Brendan Downey's death.

[Trial Tr., Feb. 18, 2009, 45:12-46:17].  The prescriptions that Vento and Clendening

received from Dr. Shaygan also featured prominently in Cronin's opening statement to

show Defendant was nothing but a drug dealer, that he did not conduct physical exams on

patients, failed to take back original prescriptions after giving patients a corrected one,

wrote prescriptions for one patient but intended for another, and wrote prescriptions for

patients who failed drug tests. [Trial Tr., Feb. 18, 2009, 46:18-48:23].  The DEA-6 reports,

which indicated that Vento was a "federal cooperating witness" and had successfully made

a recording of his conversation with a member of the defense team, and that he ultimately

was signed up as a confidential source, would have been a significant factor in a jury's

determination of Vento's credibility.   These DEA-6s would have further revealed

Clendening's role in the collateral investigation.   Indeed, the re-cross-examination I

permitted of Vento and Clendening, after reserving on Defendant's Motion to Dismiss the

indictment, reflected the impeachment value of this information. [Trial Tr., Mar. 10, 2009, 81:9-14] (Markus: "Are those your signatures next to every one of those lines [on the confidential source agreement]?" Vento: "Yes, it is." Markus: "Okay. So you signed that you acknowledged that you could get compensation for your services [as a confidential source], right?" Vento: "Correct."). *See also* Tr. Mar. 17, 118:21-129:1 (Markus: "Do you believe that the facts of the tape recordings and what Vento and Clendening did in this case aided the defense in getting not guilty verdicts? Cronin: "It certainly aided the defense. I don't know whether or not your client would have been acquitted but for that, but it certainly was used very well by the defense.).

Further, certain of the DEA-6 reports, including those of interviews with Tucker, McQuarrie, Andrew Gribben, and Enrique Betancourt, include favorable information regarding Dr. Shaygan's activities with respect to government witnesses.[9] Markus made repeated requests to the prosecution for DEA-6s of witnesses who had positive things to say about Dr. Shaygan, including the DEA-6 for Courtney Tucker, who from the defense's perspective was a favorable witness to Dr. Shaygan despite being called as a government

---

[9] For example, as discussed above, the DEA-6 report of the Tucker interview on August 15, 2008 reflected positive statements made by Tucker about the quality of care she received; specifically, that Dr. Shaygan provided "thorough examinations including flexibility exercises," "seemed very interested in her well being," and had prescribed her "antibiotics for a urinary tract infection." The DEA-6 report of the Gribben interview on August 13, 2008 reflected that Gribben filled out a patient questionnaire, that Shaygan reviewed his MRI and pressed on various areas of his back, and that at later visits he was weighed and was administered a urinalysis drug test. The DEA-6 report of Enrique Betancourt reflected that Dr. Shaygan requested Betancourt to provide his medical records, and that Dr. Shaygan performed standard physical procedures. Finally, the DEA-6 report of the interview with Wayne McQuarrie reflected that Dr. Shaygan conducted a thorough medical exam on him to include height, weight, and blood pressure, and that Shaygan refused to prescribe certain medication that he did not need.

witness.[10]   [Tr. Mar. 17 109:1-24]. The DEA-6 reports were material to the guilt of Dr. Shaygan because they spoke to the quality of defendant's medical care and directly related to the prosecution's theory that the defendant was not a legitimate doctor.  Therefore, had the revelation of prosecutorial misconduct not arisen to color the verdict of acquittal reached by the jury, there was a reasonable probability that these DEA-6 reports would have made a difference to the outcome of the case.[11]   Accordingly, the failure to disclose the DEA-6 reports to the defense prior to trial was a violation of the prosecution's disclosure obligations under *Brady*.

       2.   <u>Giglio</u>

The ruling in *Giglio v. United States*, 405 U.S. 150, 154-55, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972) has been interpreted by the Eleventh Circuit as "a species of Brady error."  *Ford v. Hall*, 546 F.3d 1326, 1331 (11th Cir. 2008).  The disclosure requirement of Giglio ensures that " 'the jury knows the facts that might motivate a witness in giving testimony.' " *Brown v. Wainwright*, 785 F.2d 1457, 1465 (11th Cir. 1986) (quoting *Smith v. Kemp*, 715 F.2d 1459, 1467 (11th Cir. 1983)).  Accordingly, the prosecution has a duty to disclose evidence of promises made to a witness in exchange for testimony.  *Ford v. Hall*, 546 at 1332 (11th Cir. 2008) (citing *Giglio*, 405 U.S. at 154-55; *Tarver v. Hopper*, 169 F.3d 710, 716 (11th Cir. 1999)).  "Even mere 'advice' by a prosecutor concerning the future

---

[10] Although the DEA-6s were provided to the Court pursuant to court order, the prosecution's *Brady* disclosure obligation is to the defense, not the court.

[11] The government's position that these documents did not constitute Brady material because they were consistent with the government's theory is unavailing, because jurors may well view the information as inconsistent with the government's case and exculpatory as to Dr. Shaygan.

prosecution of a key government witness may fall into the category of discoverable evidence." *Tarver v. Hopper*, 169 F.3d 710, 717 (11th Cir. 1999) (quoting *Haber v. Wainwright*, 756 F.2d 1520, 1524 (11th Cir. 1985)).

The government concedes that it should have disclosed the fact that Vento and Clendening were cooperating witnesses in the USAO's collateral investigation, and not neutral witnesses as portrayed at trial. [DE 299 at 2]. Cronin was aware as of November 24, 2008 that both Vento and Clendening had agreed to record their conversations with the defense team in aid of the USAO's collateral investigation. [Tr. Mar. 17, 116:18-25, 117:20-118:3]. This cooperation with the government should have been disclosed in time for the effective use such information by defense. *United States v. Saldarriaga*, 987 F.2d 1526, 1529 n.9 (11th Cir. 1993) (*Giglio* requires prosecutors to disclose information regarding a witness' cooperation with the government); *see United States v. Russo*, 483 F. Supp. 2d 301, 308 (S.D.N.Y. 2007) (the government is only required to produce *Giglio* material for impeaching witnesses in time for effective use at trial).

At the Sanctions Hearing, Cronin attempts to make the distinction between a witness who has agreed to make recordings and one who is cooperating with the prosecution. [Tr. Mar. 17, 117:20-24]. It is clear however that, at least as soon as Vento and Clendening were given recording devices, they became aligned with the government. In fact, as DEA Agent Brown testified, Vento and Clendening should have been signed up as formal confidential informants at that point. [Tr. Mar. 16, 242:5-17]. Cronin at minimum should have known that the DEA would attempt to sign up Vento and Clendening as confidential sources or at least verified with them whether they had become confidential

informants, a fact that would be potential *Giglio* material, as conceded by Cronin. [Tr. Mar. 17, 118:4-12]. Further, Cronin had shared the fact of Clendening's testimony in the Shaygan trial with state prosecutors prior to Clendening's sentencing in his state court trial, a fact of which the state judge was also informed. This communication with counsel in Clendening's state court trial falls within the reach of *Giglio*, despite Cronin's personal belief that the significant sentence reduction received by Clendening in his state case was due only to Clendening's cooperation with state prosecutors in that case. *See* [Trial Tr., Mar. 10, 2009, 100:17-101:3] (Markus: "And the reason [Clendening's participation in the Shaygan trial] was explained to the judge to your understanding...is because your lawyer and the State Attorney wanted to make sure that the judge would not sentence you to three years in prison, correct?" Clendening: "Yes."). Accordingly, the failure to disclose to the defense that Vento and Clendening were cooperating with the government and that Clendening's role in the Shaygan trial was made known to the Judge in Clendening's state court prosecution was a violation of *Giglio*.

       3.   Jencks

     The Jencks Act, 18 U.S.C. § 3500, provides that "(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement...of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified."[12] The government has conceded that it violated its discovery obligations under the Jencks Act by failing to disclose Vento's and Clendening's recorded statements

_____

    [12] The Jencks Act, 18 U.S.C. § 3500 was incorporated into Fed. R. Crim. P. 26.2 in 1979. *See also United States v. Jordan*, 316 F.3d 1215, 1227 n. 17 (11th Cir.2003).

38

to the defense at the time of their trial testimony.[13] [DE 299, p.2].  The recordings related to the subject matter as to which the witness has testified.  Vento's recording of his conversation with defense investigator Michael Graff about Brendan Downey and Dr. Shaygan related to his trial testimony, and Clendening's first conversation with Markus, although cut short by a malfunction of the recording device, also related to his testimony where he discussed the frequency of his visits with Dr. Shaygan.[14]  Gilbert, an experienced prosecutor who recognized that the collateral investigation was unique and unprecedented, listened to the Vento recording and failed to consider the need for disclosure under *Jencks*. [Tr. Mar. 17, 44:8-15].  More egregiously, Cronin prior to trial similarly knew that the Vento recording had been made, but made no effort to check with Gilbert or AUSA Davis as to whether the recording constituted *Jencks* material. [Tr. Mar. 17, 117:4-19; DE 270-2, ¶ 10].

   C.   Sanctions

      1.   Hyde Amendment

   The Hyde Amendment "provides for the award of attorney's fees and [related litigation] costs to a prevailing criminal defendant who establishes that the position the government took in prosecuting him was vexatious, frivolous, or in bad faith."  *United*

_____

   [13] By the terms of the Jencks Act, the Vento and Clendening recordings constitute a "statement." Section 3500(e) of the Jencks Act defines the term "statement" as "(1) a written statement made by said witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury."

   [14] Clendening's second recording, as discussed above, was not known to the prosecution team until Clendening referenced its existence during trial.

*States v. Gilbert*, 198 F.3d 1293, 1296 (11th Cir.1999).[15]  Because these words are not defined in the statute, they must be given their ordinary meaning.  *Id.* at 1298.  "Vexatious means without reasonable or probable cause or excuse.  A frivolous action is one that is groundless ... with little prospect of success; often brought to embarrass or annoy the defendant.  Finally, bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; ... it contemplates a state of mind affirmatively operating with furtive design or ill will."  *United States v. Adkinson,* 247 F.3d 1289, 1291 (11th Cir. 2001)  The criminal defendant bears the burden of proving this conduct or position by the government by a preponderance of the evidence, as well as establishing that he is otherwise qualified for the award under the

---

[15] The full text of the Hyde Amendment reads as follows:

> During fiscal year 1998 and in any fiscal year thereafter, the court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act, may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code. To determine whether or not to award fees and costs under this section, the court, for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might reveal the identity of an informant or undercover agent or matters occurring before a grand jury) and evidence or testimony so received shall be kept under seal. Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails from any funds made available to the agency by appropriation. No new appropriations shall be made as a result of this provision.

18 U.S.C. § 3006A.

law.  *Id.*  In sum, "a lot more is required under the Hyde Amendment than a showing that the defendant prevailed at the pre-trial, trial, or appellate stages of the prosecution. A defendant must show that the government's position underlying the prosecution amounts to prosecutorial misconduct - a prosecution brought vexatiously, in bad faith, or so utterly without foundation in law or fact as to be frivolous."  *Gilbert*, 198 F.3d at 1299.  The Court in *Gilbert* further discussed the legislative history and intent of the Hyde Amendment, nothing that it was "targeted at prosecutorial misconduct, not prosecutorial mistake...[such as] keeping information from [the defendant] that the law says [the government] must disclose, hiding information, not disclosing exculpatory information and suborning perjury...."  *Id.* at 1304 (quoting 143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997)) (internal quotations omitted).

As I had discussed at the beginning of this Order, and as conceded by the defense, the commencement of this prosecution as to the original indictment was not frivolous or commenced in bad faith. [Tr. Mar. 17, 175:21-176:3].  However, I conclude that the position taken by Cronin in filing the superseding indictment; initiating and pursuing the collateral investigation based on unfounded allegations; suppressing information about the roles of two key government witnesses as cooperating witnesses in the collateral investigation; and attempting to secure evidence from the collateral investigation that would have jeopardized the trial and severely prejudiced the Defendant, constitute bad faith.[16]  These were conscious and deliberate wrongs that arose from the prosecutors' moral obliquity and

---

[16] The term "position of the United States" includes the activities of the "agency" involved and is not limited to the litigating position taken by the Department of Justice. *United States v. Gardner*, 23 F. Supp. 2d 1283 (N.D. Okla. 1998).

41

egregious departures from the ethical standards to which prosecutors are held.  *Gilbert*, 198 F.3d at 1299 (noting that bad faith in the law enforcement context is defined to include "reckless disregard for the truth") (citing *Franks v. Delaware*, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684, 57 L. Ed. 2d 667 (1978)).

The Hyde Amendment is applicable to conduct by the government during the course of a prosecution taken in bad faith even if the commencement of the prosecution was commenced legitimately.  *See Hall v. Cole*, 412 U.S. 1, 15, 93 S. Ct. 1943, 1951, 36 L. Ed. 2d 702 (1973) ("'bad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation."); *Dictiomatic, Inc. v. U.S. Fidelity & Guar. Co.*, 127 F. Supp. 2d 1239, 1248 (S.D. Fla. 1999) ("the bad faith which will warrant an award of fees can be...bad faith in the conduct of the lawsuit").  Here, the United States concedes to the imposition of attorney's fees and costs for proceedings related to the Motion to Dismiss and Motion for Sanctions despite the fact that the indictment against Dr. Shaygan as originally brought was not frivolous, vexatious, or in bad faith.  To the extent that the United States is arguing that the Hyde Amendment would be inapplicable so long as the prosecution was originally brought in good-faith, such an interpretation would undermine the very purpose of the Hyde Amendment to target prosecutorial misconduct.[17]  Indeed,

---

[17] Courts routinely find bad faith in a party's conduct during the course of litigation. *Eagle Hosp. Physicians LLC v. SRG Consulting, Inc.*, 2009 WL 613603 (11th Cir. Mar. 12, 2009) (a party demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order*); Kreager v. Solomon & Flanagan, P.A.*, 775 F.2d 1541, 1543 (11th Cir. 1985) (bad faith exception encompasses bad faith acts preceding and during litigation); *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F. 2d 1004, 1014 (11th Cir. 1985) (imposition of attorney's fees may be appropriate if an opponent has acted in bad faith, vexatiously, or wantonly as part of the litigation process itself); *Rothenberg v. Sec. Mgmt Co., Inc.*, 736 F.2d 1470, 1472 (11th Cir.1984) ("In determining the propriety of a bad faith fee award, 'the inquiry will focus primarily on the conduct and motive of a party, rather than

courts have held that discovery violations in the course of a prosecution can form a basis for the award of attorney's fees under the Hyde Amendment. *United States v. Ranger Electronic Comm., Inc.*, 22 F. Supp. 2d 667 (W.D. Mich. 1998); *United States v. Troisi*, 13 F. Supp. 2d 595, 596 (N.D.W. Va. 1998) (violation of the duty of a prosecutor to know about and disclose evidence favorable to a person accused may constitute bad faith in context of Hyde Amendment).  In *Ranger*, the court held that the Hyde Amendment was intended specifically to curb abuses associated with the subordination of perjury and the failure to disclose exculpatory evidence, and concluded that the failure by the prosecution to share exculpatory information under *Brady*, as revealed by documents obtained through the Freedom of Information Act, constituted "bad faith" within the meaning of the Hyde Amendment.[18]  *Id.* at 673.  While the government conveniently categorizes these acts of bad faith as confined to the collateral investigation, these acts were committed to avoid weakening the government's case-in-chief and for the purpose of severely prejudicing the interests of Dr. Shaygan.  Accordingly, I conclude that an award of attorney's fees and costs of Dr. Shaygan incurred after the Superseding Indictment was filed is warranted.

Recovery under the Hyde Amendment, however, is subject to the procedures and

---

on the validity of the case.' ") (internal citations omitted).

[18] The district court's decision in *Ranger* was reversed on appeal on other grounds. The Sixth Circuit held that the defendant's Hyde Amendment motion was untimely because it was not filed within thirty days of final judgment as required by the Equal Access to Justice Act, and that time limitation was jurisdictional and cannot be waived.  *Ranger*, 210 F.3d 627, 631 (6th Cir. 2000).  This holding was overruled by the Supreme Court's recent decision in *Scarborough v. Principi*, 541 U.S. 401, 124 S. Ct. 1856, 158 L. Ed. 2d 674 (2004), where the Supreme Court held that the EAJA's "30-day deadline for fee applications and its application-content specifications are not properly typed 'jurisdictional.'" *Id.* at 1865.

limitations set forth under the statute and in the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d).   *See United States v. Aisenberg,* 358 F.3d 1327, 1339-40 (11th Cir. 2004) ("To date, all circuits to consider this issue have concluded that the procedures and limitations in § 2412 incorporated by the Hyde Amendment are the procedures and limitations in § 2412(d)....We now join those circuits.").   For example, a criminal defendant must show that: (1) his trial had been in progress during fiscal year 1998 or a subsequent year; (2) his net worth was less than two million dollars; (3) he had been a "prevailing party" in his criminal case, even though subject to possible retrial upon remand; (4) that his legal representation was not the result of court-appointment; and (5) his attorney's fees and costs are "reasonable."   *Adkinson*, 247 F.3d at 1291, n.2.   Dr. Shaygan has filed a declaration [DE 310] attesting that he meets the conditions for recovery of attorney's fees and costs under the Hyde Amendment, including the fact that at the time this case was commenced against him up to the present time, his net worth was less than $ 2 million.

Having determined that an award of attorney's fees and costs is warranted under these circumstances, and further that Dr. Shaygan is eligible for such an award, I turn to the amount of fees and costs to be awarded.   Under the EAJA, attorney fee awards are capped at $125 per hour unless subject to "special factors" justifying a departure from the $125 hourly limitation.   28 U.S.C. § 2412(d)(2)(A)(ii) (""[A]ttorney fees shall not be awarded in excess of $125 per hour unless a court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee."); *Pollgreen v. Morris*, 911 F.2d 527, 538 (11th Cir. 1990) (a court's consideration of the increase in the cost of living was a permissible basis to raise the statutory fee rate under the EAJA, but should describe mathematically the basis of all

44

cost of living adjustments).[19]   I conclude that a cost of living adjustment is appropriate

because the $125 cap was established in 1996. Pub. L. 104-121, 1996 HR 3136 (Mar. 29,

1996).   Courts in this district have held that the rate of increase in the Consumer Price

Index ("CPI") is a proper figure on which to base an enhancement of the hourly rate cap

in order to reflect an increase in the cost of living.  *Brungardt v. Commissioner of Social

Sec.*, 234 Fed. App. 889, 890 (11th Cir.  2007); *Bruland v. Howerton*, 742 F. Supp. 629,

636 (S.D. Fla. 1990).  According to the Bureau of Labor Statistics, the CPI in 1996 was

157, and the CPI in 2008 was 215, reflecting a 37% increase in the cost of living and a

corresponding increase of the hourly rate from $125 to $171.[20]  As this rate is below the

prevailing market rate for experienced criminal defense attorneys,  the hourly rate awarded

is $171.  *Brungardt*, 234 Fed. App. at 891 (awarding increased hourly rate based on CPI

but not exceeding the fair market rate); *Norman v. Housing Auth. of City of Montgomery*,

---

[19] The Eleventh Circuit has previously noted that "[m]uch of the EAJA case law defines "special factor" in § 2412(d)(2)(A)(ii) of the EAJA by what it is not.  *Aisenberg*, 358 F.3d at 1343.  In *Pierce v. Underwood*, 487 U.S. 552, 573, 108 S. Ct. 2541, 2554, 101 L. Ed. 2d 490 (1988), the Supreme Court stated that special factors in the context of § 2412(d)(2)(A)(ii) do not include "[t]he novelty and difficulty of issues, the undesirability of the case, the work and ability of counsel, and the results obtained," nor "factors applicable to a broad spectrum of litigation" including "the contingent nature of the fee." *Id.* (internal quotation marks omitted).  Similarly, in *Pollgreen*, the Court noted that special factors in the context of § 2412(d)(2)(A)(ii) do not include "the motivations of the attorneys in bringing the case, the pro bono nature of the case, the fact that the litigation served to 'vindicate public rights,' and the hardships experienced by counsel in departing from the statutory hourly rate." 911 F.2d at 537 (11th Cir. 1990) (citing *Jean v. Nelson*, 863 F.2d 759, 775-76 (11th Cir.1988)).  Further, "[a] delay that occurred because the government litigated a position that lacked substantial justification is not a permissible special factor because any litigation eligible for EAJA fees, by definition, involves the government's pursuit of an unjustified position." *Id.* at 538.  I conclude that there are no special factors here that would warrant an increase in the hourly rate.

[20] Bureau of Labor's Consumer Price Index for All Urban Consumers, All Items Index, at ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txtx.

836 F.2d 1292, 1303 (11th Cir.1988) ("a court is itself an expert on the question of a reasonable hourly rate and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value") (internal quotations omitted).   Pursuant to the time records filed under seal by the defense indicating a total of 2884.5 hour worked as of the filing of the Superseding Indictment, attorney fees in the total amount of is $493,764.00. Inclusive of other reasonable litigation expenses, the total award of attorney's fees and costs is $601,795.88.[21]

> ### 2.   Inherent Power

Federal courts are vested with inherent power to remedy the misconduct of attorneys and parties practicing before them.  *U.S. v. Butera,* 677 F.2d 1376, 1383 (11th Cir. 1982) ("We join . . . in the sentiments of our brethren in the Second Circuit that it may be necessary to consider more direct sanctions to deter prosecutorial misconduct...[w]e encourage the district courts in this circuit to remain vigilant, give appropriate curative instructions when called for, and consider more formal disciplinary action in cases of persistent or flagrant misconduct.") (relying on *United States v. Modica*, 663 F.2d 1173, 1182-86 (2d Cir. 1981)).  Available sanctions include "(1) contempt citations; (2) fines; (3) public reprimands; (4) suspension from the court's bar; (5) removal or disqualification from

---

[21] Defendant further seeks sanctions under 28 U.S.C. § 1927, which provides in pertinent part, that "[a]ny attorney...who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." As I do not impose the award of attorney's fees and costs on Cronin or Hoffman personally, sanctions under 28 U.S.C. § 1927 are unwarranted.

office; and (6) recommendations to bar associations to take disciplinary action."[22] *Wilson*,

149 F.3d at 1304 (citing Bennett L. Gershman, Prosecutorial Misconduct Ch. 13 (1997));

*see also United States v. Helmandollar,* 852 F.2d 498, 502 (9th Cir. 1988) ("We note that

a variety of sanctions exist to address acts of prosecutorial misconduct, including: appellate

reversal; contempt citations; reprimand in a published opinion that specifically identifies the

offending prosecutor or government agents by name; removal from office; discipline by the

legal profession; and civil actions for damages.")[23]

In light of the extensive findings of fact above, I conclude that imposition of

additional sanctions on the prosecution team and supervisory personnel within the USAO

is appropriate.  *See Wilson*, 149 F.3d 1303-4 ("[W]e want to make clear that improper

remarks and conduct in the future, especially if persistent, ought to result in direct

sanctions against an offending prosecutor individually....And prosecutors must expect that

this court will support district judges who take reasonable steps to correct prosecutorial

conduct that is not right."); *Modica*  663 F.2d at 1185 ("We suspect that the message of a

single 30-day suspension from practice would be far clearer than the disapproving remarks

in a score of appellate opinions.").   Cronin's personal involvement and Hoffman's

secondary role in filing the Superseding Indictment; instigating and pursuing the collateral

witness tampering investigation; engaging in discovery violations, and creating a potential

---

[22] As provided by the Rules Governing Attorney Discipline of this District ("Rules") contained within the Local Rules of this District, discipline for misconduct may consist of (a) disbarment, (b) suspension, (c) reprimand, (d) monetary sanctions, (e) removal from this Court's roster of attorneys eligible for practice before this Court, or (f) any other sanction the Court may deem appropriate.  Rule I.B.

[23] As attorney's fees are awarded under the Hyde Amendment, I do not rely on the Court's inherent power to award attorney's fees.

conflict-of-interest under *McLain* for the defense team, placed Dr. Shaygan's liberty at unnecessary risk and violated their moral obligation to the accused. The power to sanction Cronin for this misconduct is in no way decreased because Dr. Shaygan was acquitted, as the prosecutor's error is still error, notwithstanding the result of or prejudice from that error. *Cf. Wilson*, 149 F.3d at 1303 ("One may think that unless a conviction is reversed, no error has occurred. Such a proposition is incorrect. That we find an error not to be reversible does not transmute that error into a virtue. The error is still an error. And urging the error upon the trial court still violates the United States Attorney's obligation to the court and to the public."). Nor does the availability of an alternate remedy (the re-cross of Vento and Clendening) excuse Cronin's misconduct. S*ee In re Mroz*, 65 F.3d at 1575 (pointing out that "although certain conduct may or may not be violative of Rule 11 or Bankruptcy Rule 9011, it does not necessarily mean that a party will escape sanctions under the court's inherent power"). Therefore, I conclude that under these circumstances, a public reprimand of Cronin and Hoffman is necessary to deter future misconduct.

Likewise, the imposition of sanctions against the USAO and its supervisory personnel within the USAO, particularly Gilbert and to an extent Davis, is warranted. Gilbert was grossly negligent in her treatment of this significant and unique witness tampering investigation against defense counsel during the course of an ongoing criminal prosecution, by failing to properly seek approval for such an investigation pursuant to USAO policy, failing to seek the necessary information about or independently verify the basis for Cronin's belief that a witness tampering investigation was necessary, pursuing the investigation despite no evidence of wrongdoing after she heard the initial recording, and failing to question whether Vento and Clendening should be used as informants after being

48

told they were not following the instructions of the DEA Agent.  Davis, in his capacity as Acting Chief of the Narcotics division, failed to inform Cronin and the Court that a key prosecution witness had been signed up as a confidential source.  Such deficient oversight must be remedied to ensure that prosecutors do not act beyond the bounds of ethics in their zeal to secure convictions.  Accordingly, it is hereby

ORDERED and ADJUDGED that

1.    Defendant's Motion for Sanctions [DE 287] is GRANTED.

2.    Attorney's fees and costs in the amount of $601,795.88 are awarded to the Defendant and shall be paid within 30 days of the date of this Order.

3.    The USAO is enjoined from engaging in future witness tampering investigation of defense lawyers and team members in any ongoing prosecution before me without first bringing such matters to my attention in an *ex parte* proceeding.

4.    A public reprimand is entered against the United States Attorney's Office and specifically against AUSA Karen Gilbert, Sean Cronin, and Andrea Hoffman.

5.    The USAO shall provide within 10 days of the date of this Order the contact information for the relevant disciplinary body of the Bar(s) of which AUSA Cronin and Hoffman are members.  Upon receipt of the information, I will forward a copy of this Order to such disciplinary bodies and request that appropriate disciplinary action be taken.

6.    The USAO shall advise the Court in writing as to the outcome of the independent investigation being conducted by the Department of Justice Office of Professional Responsibility.

49

7.      The USAO shall advise the Court within 30 days of the date of this Order as to the procedures that have been instituted to enhance supervision of collateral investigations undertaken by USAO and DEA personnel.  Further, the USAO shall similarly report on any enhancements to the USAO's "taint wall" policy and its enforcement.

8.      I reserve to impose any further sanctions and/or disciplinary measures as may be necessary against AUSA Cronin and Hoffman after reviewing the results of the Justice Department's investigation.

9.      This opinion shall be placed in the public records of the Court and otherwise released for general publication.

DONE and ORDERED in Chambers at Miami, Florida, this 14th day of April, 2009.


_____
THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc:
All counsel of record
U.S. Magistrate Judge Chris M. McAliley